# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP1880 |
| COMPLETE TITLE: | United Food & Commercial Workers Union, Local 1473, Dennis A. Warne, Charles R. Seeley and Pamela Collins, Plaintiffs-Respondents, v. Hormel Foods Corporation, Defendant-Appellant. |

ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | March 1, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 5, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Rock |
| JUDGE: | Michael R. Fitzpatrick |

| | |
|---|---|
| JUSTICES: | |
| CONCUR & DISSENT: | ROGGENSACK, C.J., PROSSER, J., concur and dissent. (Opinion Filed) |
| DISSENTED: | Gableman, Ziegler, J.J., dissent. (Opinion Filed) |
| NOT PARTICIPATING: | R.G. Bradley, J., did not participate. |

ATTORNEYS:

For the defendant-appellant, there were briefs by *Thomas P. Krukowski* and *Whyte Hirschboeck Dudek*, *S.C.*, Milwaukee, and oral argument by *Thomas P. Krukowski*.


For the plaintiffs-respondents, there was a brief by *Mark A. Sweet* and *Sweet and Associates, LLC*, Milwaukee, and oral argument by *Mark A. Sweet*.

2016 WI 13

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP1880
(L.C. No. 2010CV2595)

STATE OF WISCONSIN        :        IN SUPREME COURT

**United Food & Commercial Workers Union, Local 1473, Dennis A. Warne, Charles R. Seeley and Pamela Collins,**

      **Plaintiffs-Respondents,**

      **v.**

**Hormel Foods Corporation,**

      **Defendant-Appellant.**

**FILED**

**MAR 1, 2016**

Diane M. Fremgen
Clerk of Supreme Court

---

APPEAL from a judgment and order of the Circuit Court for Rock County, Michael R. Fitzpatrick, Judge. *Affirmed.*

¶1 SHIRLEY S. ABRAHAMSON, J. This is an appeal from a judgment and order of the circuit court for Rock County, Michael R. Fitzpatrick, Judge, in favor of United Food & Commercial Workers Union, Local 1473 (and various individuals[1]), the

---

[1] Dennis A. Warne, Charles R. Seeley, and Pamela Collins join as plaintiffs. We refer only to the Union as the plaintiff for simplicity.

plaintiffs, against Hormel Foods Corporation, the defendant. The court of appeals certified the appeal to this court pursuant to Wis. Stat. § 809.61 (2013-14).[2]

¶2   This is a "donning and doffing" wage and hour case. Employees seek compensation for time spent putting on ("donning") and taking off ("doffing") company-required clothing and equipment before and after shifts at Hormel's canning plant located in Beloit, Wisconsin.

¶3   The Union filed a class action on behalf of a class of current and former employees in Hormel's plant, alleging that Hormel violated Wisconsin wage and hour laws by failing to pay the employees for time spent at the plant putting on and taking off the required clothing and equipment.  Because the time spent putting on and taking off the required clothing and equipment is not included in the employees' compensation, the Union asserts that the employees are working more than 40 hours per week without being paid overtime.

¶4   The certification presents two questions:

(1) Is the donning and doffing of the company-required clothing and equipment compensable work time or non-compensable preliminary and

---

[2] All subsequent references to the Wisconsin statutes are to the 2013-14 version unless otherwise indicated.

postliminary activities under Wis. Admin. Code § DWD 272.12(2)(e) (Feb. 2009)[3]; and

(2) Even if the time spent donning and doffing is otherwise compensable work time, is this time non-compensable under the doctrine of de minimis non curat lex?

¶5 After a bench trial, the circuit court issued a comprehensive decision holding in favor of the Union and requiring Hormel to compensate its employees for time spent donning and doffing the required clothing and equipment at the plant at the beginning and end of the day and during unpaid meal periods (for the one percent of employees who left the plant during their meal periods). The circuit court further held, "Hormel has failed to carry its burden to show the applicability of the de minimis doctrine, and, therefore, that doctrine is not controlling (assuming it exists at all in Wisconsin law)."

¶6 Based on these conclusions, the circuit court awarded the class monetary damages of $195,087.30 broken down as follows: (1) $180,087.30 in unpaid wages for 5.7 minutes per day spent donning and doffing the required clothing and equipment; and (2) pursuant to a stipulation of the parties, $15,000 in damages for unpaid meal periods.

¶7 We conclude:

---

[3] All subsequent references to the Wisconsin Administrative Code are to the February 2009 register date unless otherwise noted.

(1) Wisconsin Admin. Code § DWD 272.12 requires Hormel to compensate its employees for the 5.7 minutes per day spent donning and doffing the clothing and equipment at the beginning and end of the day. Relying on the Tyson Foods case, Weissman v. Tyson Prepared Foods, Inc., 2013 WI App 109, 350 Wis. 2d 380, 838 N.W.2d 502, as did the circuit court, we conclude, as did the circuit court, that the employees' donning and doffing clothing and equipment at the beginning and end of the day brought Hormel into compliance with federal food and safety regulations and was integral and indispensable to sanitation and safety in the employees' principal work activities, namely food production.[4]

(2) The donning and doffing of clothing and equipment at the beginning and end of the day does not fall within the doctrine of de minimis non curat lex. The wages involved are not a "trifle" either for the employees or for Hormel.

---

[4] The court granted review in the Tyson Foods case. See Weissman v. Tyson Prepared Foods, Inc., 2013 WI App 109, 350 Wis. 2d 380, 838 N.W.2d 502, review granted, 2014 WI 3, 352 Wis. 2d 351, 842 N.W.2d 359. The review was dismissed prior to argument or a decision by this court, however, when the parties settled the litigation.

¶8 We also briefly address whether the time spent donning and doffing Hormel's required clothing and equipment during meal periods is considered compensable work time.

¶9 On appeal Hormel argues that the Tyson Foods case was wrongly decided and "puts state law at odds with federal authority, namely, with the U.S. Supreme Court's holding" in a recent decision, Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513 (2014). As a result, Hormel asks us to overturn Tyson Foods. We conclude that the discussion in Tyson Foods relating to compensating its employees for time spent donning and doffing the required clothing and equipment at the plant at the beginning and end of the day does not contravene Integrity Staffing.

I

¶10 The parties stipulated to many facts, and the circuit court also made numerous findings of fact following a bench trial. None of the circuit court's findings of fact are clearly erroneous. Here are the relevant facts.

¶11 The class consists of approximately 330 persons who are or were hourly employees of Hormel at the Beloit canning facility. We will refer to the class members as "the employees."

¶12 Hormel is a multi-national food company incorporated in Delaware and headquartered in Austin, Minnesota. The Union agreed that Hormel is a fine employer with a quality record and a history of producing good, safe food for customers around the world.

¶13 Hormel's Beloit canning facility prepares, cooks, cans, and ships a variety of "shelf stable" products including Hormel Chili, Mary Kitchen Hash, and Chi-Chi's Salsa, primarily for sale to consumers in retail stores. A "shelf stable" product can be stored almost indefinitely and without refrigeration.

¶14 The Beloit canning facility operates like an assembly line. Raw ingredients enter at one end of the facility and are stored in a cooler or dry storage. Products (which may consist of meat and seasoning ingredients) are out in the open in about one-half of the plant.

¶15 Employees grind and blanch the meat, and cook and can the product. A sophisticated, high-temperature, heavy-pressure process is used to make the product shelf stable. The product is moved to areas designated for pickup to ship to distribution centers or retailers.

¶16 Regulations promulgated by the United States Department of Agriculture (USDA), the United States Food and Drug Administration (FDA), and the federal Occupational Safety and Health Administration (OSHA) govern Hormel's production facilities. Products containing meat are regulated by the United States Department of Agriculture Food Safety Inspection Service. Products not containing meat are regulated by the United States Food and Drug Administration. The federal Occupational Safety and Health Administration regulates workplace safety.

¶17 Federal regulations require Hormel to meet standards of cleanliness, quality, and safety in its plant and products. For example, the federal regulations require that persons working with food protect against contamination of food by maintaining hygienic practices like washing hands and wearing clean outer garments. While the federal regulations set forth performance standards, they generally do not require these standards be satisfied in any particular manner.

¶18 Hormel has adopted Work Rules in an effort to meet performance standards, maintain sanitation, and protect employees and consumers. The Work Rules require that employees wear certain clothing and equipment. If employees do not wear the required clothing and equipment, the employees are subject to discipline, up to discharge.

¶19 Specifically, Hormel's Work Rules require employees wear Hormel-provided hard hats, hearing protection, and eye protection. All exposed head and facial hair must be covered by a hair net. Employees are to wear clean and sanitary footwear at all times.[5] Clothing is provided by Hormel and must be changed daily or more often (as good sanitation practices dictate) and shall not be worn outside the plant. Hormel leases the clothes from Aramark, which picks up worn clothes, launders them, and drops off clean clothes.

---

[5] The shoes must be kept at the facility and are called "captive shoes."

¶20 Hormel does not compensate employees for time spent putting on or taking off (donning and doffing) the required clothing and equipment at the beginning and end of the day.

¶21 The parties stipulated that the median time for donning and doffing the required clothing and equipment at the beginning and end of the day, washing hands, and walking to and from the assigned work stations was 5.7 minutes per day, 28.5 minutes per week, or approximately 24 hours per year.[6]

¶22 The employees must "swipe in" between 1 and 29 minutes before the scheduled start of their shift. The employees must have their clothes changed, be swiped in, and be at their

---

[6] This stipulation includes not just the time spent donning and doffing the required clothing and equipment, but also time spent washing hands and walking to and from workstations. Nonetheless, under Wis. Admin. Code § DWD 272.12(1)(a)2., the "workday" is defined as "the period between 'the time on any particular workday at which such employee commences their principal activity or activities' and 'the time on any particular workday at which they cease such principal activity or activities.'"

Because we hold that donning and doffing the required clothing and equipment at the beginning and end of the day is integral and indispensable to the employees' principal work activity of food preparation, the donning and doffing is itself a principal work activity. See IBP, Inc. v. Alvarez, 546 U.S. 21, 37 (2005) ("[W]e hold that any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity . . . .'"). As a result, the time spent walking to or from workstations or washing hands occurs after the employees' "workday" begins and is thus compensable. See IBP, 546 U.S. at 37 ("Moreover, during a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is . . . covered by the FLSA.").

8

workstations at their assigned start times or they will be considered tardy. The employees are paid by Hormel beginning at the scheduled start of their shift, not at the time of swiping in.

¶23 As a result, the employees are not paid for the time spent putting on their clothing and equipment before the scheduled start of their shift. The employees are also not paid for a 30-minute meal period. To leave the facility during the 30-minute meal period, the employees must doff their clothing and equipment before leaving the facility and don their clothing and equipment before returning to work.

¶24 Upon completion of the assigned duties for the day and after being released from work, the employees must "swipe out" and change back into their street clothes.

¶25 The employees are paid until they officially "swipe out." Thereafter, the employees must change from their required clothing and equipment into their street clothes. As a result, the employees are not paid for the time spent taking off their clothing and equipment after they swipe out.

¶26 In sum, the paid "workday" for employees at Hormel is measured from the scheduled commencement of the shift to the swipe out at the electronic clock after release by the supervisor less 30 minutes for the employees' meal period.

¶27 The circuit court found, on the great weight of the credible evidence, that putting on and taking off the clothing and equipment required by Hormel at the beginning and end of the day is integral and indispensable to the performance of the

employees' principal activities. According to the circuit court, a close connection exists between the donning and doffing; compliance with the federal regulations of the United States Department of Agriculture, the Food and Drug Administration, and Occupational Safety and Health Administration; and the employees' principal activities, producing canned food.

II

¶28 The standard of review applicable to the instant case is oft stated and is as follows:

¶29 This court will not overturn factual findings of the circuit court unless the findings are clearly erroneous. Royster-Clark, Inc. v. Olsen's Mill, Inc., 2006 WI 46, ¶11, 290 Wis. 2d 264, 714 N.W.2d 530.

¶30 The appeal revolves around the interpretation and application of Wis. Admin. Code § DWD 272.12. When interpreting administrative regulations the court uses the same rules of interpretation as it applies to statutes. Wis. DOR v. Menasha Corp., 2008 WI 88, ¶45, 311 Wis. 2d 579, 754 N.W.2d 95. Interpretation and application of a regulation is ordinarily a question of law that this court determines independently of the circuit court or court of appeals, but benefiting from the analysis of the other courts. State v. Brown, 2006 WI 131, ¶18, 298 Wis. 2d 37, 725 N.W.2d 262.

¶31 To determine the meaning of a regulation, we turn first to the text. Each word shall be interpreted so as to give it meaning, and none shall be treated as superfluous. See In re

10

*Guardianship of James D.K.*, 2006 WI 68, ¶16, 291 Wis. 2d 333, 718 N.W.2d 38. The context of the regulation and case law interpreting the regulation are also considered.

¶32 The parties dispute whether a circuit court's findings that an activity is integral and indispensable to the employees' principal activities is a question of fact or a question of law. If the question is one of fact, this court will not overturn the factual findings of the circuit court unless the findings are clearly erroneous. *Wis. DOR*, 311 Wis. 2d 579, ¶45. If the question is one of law, this court decides the question independently while benefiting from the analyses of the circuit court and court of appeals. *Wis. DOR*, 311 Wis. 2d 579, ¶44; *Brown*, 298 Wis. 2d 37, ¶18.

¶33 The Union raised the issue of the standard of review in its response brief, relying on a treatise that states, without citation, that "[w]hether an activity is characterized as . . . 'an integral and indispensable part' of the employee's principal activities (as distinguished from preliminary or postliminary to those activities), is a question of fact to be determined from all the circumstances."[7]

¶34 In reply, Hormel argued that the facts are undisputed and the interpretation and application of the regulations to undisputed facts is a question of law that the court decides independently of the circuit court or court of appeals.

---

[7] *See* Laurie E. Leader, *Wages and Hours: Law & Practice* § 6.03[7], at 6-30 (2015).

¶35 We need not decide this issue. Whether we examine the questions certified as ones of fact or law, we conclude the circuit court reached the correct decision.[8]

III

¶36 We examine first whether the time spent donning and doffing Hormel's required clothing and equipment at the beginning and end of the day is considered compensable work time or non-compensable preliminary and postliminary activities under Wis. Admin. Code § DWD 272.12(2)(e).

¶37 The Department of Workforce Development regulations determining an employee's work hours are found in Wis. Admin. Code § DWD 272.12.

---

[8] In the circuit court, the parties also disagreed about the burden of proof. The Union argued that it would have the burden of proof to demonstrate that the acts at issue are "work," and the burden would then shift to Hormel to demonstrate that the acts are noncompensable. Hormel disagreed with the Union's description of the burden of proof, although Hormel agreed that it had the burden of proof on the application of the de minimis doctrine.

The circuit court stated that the (undefined) burdens of proof were on the respective parties by the greater weight of the credible evidence. The circuit court viewed Hormel as having the burden of proof on the application of the de minimis doctrine.

In this court, neither party raises the issue of the allocation of the burdens of proof. As a result, we do not address the issue. See State v. Gracia, 2013 WI 15, ¶28 n.13, 345 Wis. 2d 488, 826 N.W.2d 87 (stating "we do not usually address undeveloped arguments"). Regardless of the allocation of the burdens of proof, we conclude the circuit court's decision was correct.

¶38 Wisconsin Admin. Code § DWD 272.12(1)(a)1. provides that an employee must be paid "for all time spent 'in physical or mental exertion . . . controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer's business.'"[9]

¶39 The parties agree that the donning and doffing are physical or mental exertion; are required by Hormel; and are pursued necessarily and primarily for the benefit of Hormel's business.

¶40 Compensable time is defined in the regulations in terms of a "workday." See Wis. Admin. Code § DWD 272.12(1)(a)2. Workday is defined as the "period between 'the time on any particular workday at which such employee commences their principal activity or activities' and 'the time on any particular workday at which they cease such principal activity or activities.'"[10]

---

[9] Wisconsin Admin. Code § DWD 272.12, titled "Interpretation of hours worked," states in (1)(a)1.:

(1) Principles for determination of hours worked. (a) *General requirements of sections*. 1. Employees subject to the statutes must be paid for all time spent in "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer's business." The workweek ordinarily includes "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed work place."

[10] Wisconsin Admin. Code § DWD 272.12(1)(a)2. states:

(continued)

13

¶41 This regulation leads us to the meaning of the phrase "principal activity or activities" of the employee.

¶42 "[P]rincipal activities" is defined in Wis. Admin. Code § DWD 272.12(2)(e) to include all activities that are "an integral part of a principal activity." (Emphasis added.) "Among the activities included as an integral part of the principal activity are those closely related activities which are indispensable to its performance."[11] In other words, an integral part of a principal activity includes activities that are closely related to the principal activity and indispensable to its performance.[12]

¶43 The regulation gives three examples of "what is meant by an integral part of a principal activity" justifying compensation for an employee. The third example relates to a chemical plant worker who dons and doffs clothing and equipment. This example seems closest to the facts of the instant case, and

---

'Workday,' in general, means the period between 'the time on any particular workday at which such employee commences their principal activity or activities' and 'the time on any particular workday at which they cease such principal activity or activities.' The 'workday' may thus be longer than the employee's scheduled shift, hours, tour of duty, or time on the production line. Also, its duration may vary from day to day depending upon when the employee commences or ceases their 'principal' activities (emphasis added).

[11] See Wis. Admin. Code § DWD 272.12(2)(e)c. (emphasis added).

[12] See Tyson Foods, 350 Wis. 2d 380, ¶26.

14

is therefore most helpful in deciding the instant case.   Here

are the three examples in the regulations:

> a. In connection with the operation of a lathe, an employee will frequently, at the commencement of their workday, oil, grease, or clean their machine, or install a new cutting tool.  Such activities are an integral part of the principal activity, and are included within such term.
>
> b. In the case of a garment worker in a textile mill, who is required to report 30 minutes before other employees report to commence their principal activities, and who during such 30 minutes distributes clothing or parts of clothing at the workbenches of other employees and gets machines in readiness for operation by other employees, such activities are among the principal activities of such employee.  Such preparatory activities are compensable under this chapter.
>
> c. Among the activities included <u>as an integral part of the principal activity</u> are those closely related activities which are <u>indispensable</u> to its performance. If an employee in a chemical plant, for example, cannot perform their principal activities without putting on certain clothes, changing clothes on the employer's premises at the beginning and end of the workday would be an integral part of the employee's principal activity.  On the other hand, if changing clothes is merely a convenience to the employee and not directly related to their principal activities, it would be considered as a "preliminary" or "postliminary" activity rather than a principal part of the activity.  However, activities such as checking in and out and waiting in line to do so would not

ordinarily be regarded as integral parts of the principal activity or activities.[13]

¶44 To determine whether the Hormel-required donning and doffing are merely incidental preparatory and concluding activities or are integral and indispensable to the employees' primary activities, we examine the third example, which we shall refer to as "the chemical plant example," and its interpretation and application by the court of appeals in Weissman v. Tyson Prepared Foods, Inc., 2013 WI App 109, 350 Wis. 2d 380, 838 N.W.2d 502. We shall refer to this case as the Tyson Foods case.

¶45 The plaintiffs in Tyson Foods were employees of a meat processing plant in Jefferson County, Wisconsin, operated by Tyson Prepared Foods, Inc. Tyson Foods required its employees to put on sanitary clothing and equipment before they began

---

[13] This Wisconsin regulation is substantially similar to federal regulations addressing the phrase "principal activity or activities." Compare Wis. Admin. Code § DWD 272.12(2)(e) with 29 C.F.R. § 785.24 and 29 C.F.R. § 790.8(b)-(c). Specifically, the federal regulations provide the exact same three examples that § DWD 272.12(2)(e) provides to clarify when an activity is an "integral part of a principal activity" for which employees must receive compensation.

The history and purposes of the Fair Labor Standards Act, federal regulations, Wisconsin law and regulations, and case law interpreting the statutes and regulations are set forth at length in prior cases and need not be repeated here. See, e.g., Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513, 516-18 (2014); Sandifer v. U.S. Steel Corp., 134 S. Ct. 870, 875-76 (2014); Tyson Foods, 350 Wis. 2d 380, passim.

16

their duties for each shift and to take off these items at the end of their shifts.[14]

¶46 The clothing and equipment involved in Tyson Foods are very similar to those in the instant case: hair nets; beard nets; frocks (a coat with snaps in front); vinyl gloves; vinyl sleeves; lightweight hard hats; safety glasses; ear plugs; and "captive shoes."[15]

¶47 In Tyson Foods, the court of appeals began its analysis with Wis. Admin. Code § DWD 272.12(1)(a)1. and determined that Tyson Foods controlled the employees' clothing and equipment and that requiring employees to put on and take off the required clothing and equipment primarily benefited the employer.[16] Although the court of appeals viewed this initial inquiry as necessary, the court of appeals did not consider it dispositive.[17]

¶48 The Tyson Foods court of appeals then turned its inquiry to whether the period of contested compensation is included as a "principal activity," as distinguished from

---

[14] Tyson Foods, 350 Wis. 2d 380, ¶4.

[15] Tyson Foods, 350 Wis. 2d 380, ¶4.

[16] The court of appeals concluded that the donning and doffing activities were required and controlled by Tyson Foods and primarily benefited the employer, satisfying the initial inquiry. Tyson Foods, 350 Wis. 2d 380, ¶¶17, 22.

[17] Tyson Foods, 350 Wis. 2d 380, ¶¶17, 23.

"preparatory and concluding activities," under Wis. Admin. Code. § DWD 272.12(2)(e).[18]

¶49 The court of appeals concluded in Tyson Foods that the donning and doffing are compensable because they are integral and indispensable to the principal work activities of the employees in manufacturing food.

¶50 The court of appeals in Tyson Foods relied primarily on the chemical plant example set forth in Wis. Admin. Code § DWD 272.12(2)(e)(1)c. to analyze the issue. In this example, as set forth in full above, a chemical plant employee is entitled to compensation for time spent to don and doff protective clothing and equipment at the employer's premises.

¶51 Comparing the chemical plant employees and the Tyson Foods employees, the court of appeals determined that the chemical plant example in the regulations is analogous to the donning and doffing of the Tyson Foods clothing and equipment.[19]

¶52 In both the chemical plant example and Tyson Foods, safety laws, rules of the employer, and the nature of the work all require the employees to change clothes to do their respective jobs in the chemical plant and at the Tyson Foods processing plant.[20] In the Tyson Foods case, there was no serious dispute that Tyson Foods required employees to don most

---

[18] Tyson Foods, 350 Wis. 2d 380, ¶23.

[19] Tyson Foods, 350 Wis. 2d 380, ¶¶26, 28-29, 32, 37.

[20] Tyson Foods, 350 Wis. 2d 380, ¶32.

if not all items to keep food from being contaminated, to operate more efficiently, and to limit Tyson Foods' liability for and costs associated with employees' injuries.[21]

¶53 Although Tyson Foods gave short shrift to the undisputed fact that its employees were required to don most of the clothing and equipment to protect the meat-consuming public from unappealing or even health-threatening food, the court of appeals did not. Certain of these items were worn at least in part to prevent contamination of food.[22] To the court of appeals, "needing to avoid food contamination plainly adds to the indispensability of the donning and doffing."[23]

¶54 The court of appeals concluded that donning and doffing clothes and equipment in the Tyson Foods case was indispensable for the safety of the employees and the safety of the food they help produce.[24] Thus, the time for donning and doffing was compensable.

¶55 The Tyson Foods case presents essentially the same fact situation as presented in the instant case.

¶56 Both Tyson Foods and Hormel operate food processing plants in Wisconsin subject to the same Wisconsin laws. The clothing and equipment requirements for employees of each

---

[21] Tyson Foods, 350 Wis. 2d 380, ¶28.

[22] Tyson Foods, 350 Wis. 2d 380, ¶4.

[23] Tyson Foods, 350 Wis. 2d 380, ¶36.

[24] Tyson Foods, 350 Wis. 2d 380, ¶31.

19

company are essentially the same. Likewise, the clothing and equipment requirements for employees of each company serve essentially the same purposes: the safety of the employees and the safety of the food they help produce.

¶57 The testimony with regard to the purposes of Hormel's Work Rules is similar to the undisputed facts in Tyson Foods.

¶58 The Corporate Manager of Regulatory Compliance at Hormel testified that because Hormel's process is regulated both by the Food and Drug Administration and United States Department of Agriculture, Hormel employees are required "to be clean in a manner to prevent product alteration or the general creation of unsanitary type conditions."

¶59 When asked whether Hormel's clothing and equipment requirements were to comply with federal regulations, the Corporate Manager replied, "They are. . . . The government just kind of gives us what they call performance standards you know, hey, look, we know there's various means to the ends." The required donning and doffing of the sanitary company clothing and equipment at the Beloit facility is a "means to an end," complying with the federal regulations regarding food sanitation and workplace safety.

¶60 Although several Hormel employees testified that they could do their assigned job function at Hormel without the aid of the donned and doffed items, Hormel's plant operation required proper sanitation standards and protective equipment to meet the federal regulations. Cleanliness and food safety are "intrinsic element[s]" of preparing and canning food at the

Hormel canning facility.  The clothing and equipment is integral and indispensable to the performance to the employees' job function (principal work activity) of preparing canned food. See Wis. Admin. Code § DWD 272.12(e)1.c.

¶61  Hypothetically the Hormel employees may be able to do their jobs in street clothes, however Hormel's Work Rules and Hormel's need to comply with federal regulations have created a tight connection between the donning and doffing and the principal activities of the employees.

¶62  In Tyson Foods and in the instant case, the clothing and equipment requirements at the beginning and end of the day are integral and indispensable to the employees' principal work activities.  Putting on and taking off the required clothing and equipment at the beginning and end of the day is tied directly to the work the employees were hired to perform——food production——and cannot be eliminated altogether without degrading the sanitation of the food or the safety of the employees.

¶63  The employees in Tyson Foods and in the instant case were compelled by the nature of their jobs in food production to change clothing and wear equipment to ensure food and employee safety.  The nature of the employees' work makes the employer's requirement of putting on and taking off clothing and equipment at the beginning and end of the day an integral part of the employees' principal activity.

¶64 Hormel dismisses Tyson Foods, contending that the Tyson Foods case "puts state law at odds with federal authority,

21

namely, with the United States Supreme Court holding" in a recent decision, Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513 (2014). As a result, Hormel urges us to overturn Tyson Foods.

¶65 Integrity Staffing does not conflict with Tyson Foods. Because the Wisconsin administrative regulations at issue here are substantially similar to federal regulations, federal cases may assist in our analysis. See Tyson Foods, 350 Wis. 2d 380, ¶44; see also State v. Gudenschwager, 191 Wis. 2d 431, 439, 529 N.W.2d 225 (1995).

¶66 In Integrity Staffing, one of the federal regulations involved was substantially similar to Wis. Admin. Code § DWD 272.12(e); indeed the federal regulations use an illustration substantially similar to the chemical plant example in the Wisconsin regulations.[25]

¶67 The employees in Integrity Staffing worked in a warehouse retrieving products from shelves and packaging the products for delivery to Amazon.com customers.[26] Integrity Staffing's employees were required to undergo antitheft security screening before leaving the warehouse each day.[27] The question presented to the United States Supreme Court was whether the employees' time spent waiting to undergo and then undergoing the

---

[25] See 29 C.F.R. § 790.8(c).

[26] Integrity Staffing, 135 S. Ct. at 515.

[27] Integrity Staffing, 135 S. Ct. at 515.

security screenings was compensable under the Fair Labor Standards Act.

¶68 The federal court of appeals upheld the employees' claim for compensation viewing the screenings as an integral and indispensable part of the principal activity the employees were employed to perform; the court viewed the screenings as necessary to the employees' primary work as warehouse employees and for Integrity Staffing's benefit.[28] The United States Supreme Court reversed the federal court of appeals.

¶69 Applying federal regulations substantially similar to those at issue here, the United States Supreme Court held that "an activity is integral and indispensable to the principal activities that an employee is employed to perform——and thus compensable under the [Fair Labor Standards Act]——if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities."[29] According to the Integrity Staffing Court, because the employer-required screenings were not tied to the productive work the employees were employed to perform—— retrieving and packing products——and the screenings could have been eliminated without affecting the employees' ability to perform their principal activity of retrieving and packaging

---

[28] Integrity Staffing, 135 S. Ct. at 516.

[29] Integrity Staffing, 135 S. Ct. at 519.

products,[30] the time spent waiting to undergo and undergoing security screening was noncompensable.[31]

¶70 The reasoning in Integrity Staffing is not, as Hormel argues, "squarely the opposite of the Court of Appeals' reasoning in [Tyson Foods]." Rather, the reasoning in Integrity Staffing is consistent with Tyson Foods. Nor is Integrity Staffing inconsistent with prior federal precedent.[32] Instead, Integrity Staffing once again clarified that whether an activity is integral and indispensable to an employee's principal activities is answered by reference to the nature of the employees' job duties. Simply put, the donning and doffing cases are fact dependent.

¶71 Both Integrity Staffing and Tyson Foods support the proposition that just because the employer requires employees to perform an activity that benefits the employer does not

---

[30] Integrity Staffing, 135 S. Ct. at 518.

[31] Integrity Staffing, 135 S. Ct. at 519.

[32] In Steiner v. Mitchell, 350 U.S. 247 (1956), the Court held battery plant employees were entitled to compensation for time spent showering and changing clothes because of the toxic chemicals in the plant were "indispensable to the performance of their productive work and integrally related thereto." Steiner, 350 U.S. at 249, 251. In a different case, the Court held that meatpacker employees were entitled to compensation for time spent sharpening their knives. See Mitchell v. King Packing Co., 350 U.S. 260, 262-63 (1956). Conversely, in a third case, the Supreme Court held the time spent waiting by poultry plant employees to don protective equipment was noncompensable because "such waiting . . . was two steps removed from the productive activity on the assembly line . . . .'" IBP, Inc. v. Alvarez, 546 U.S. 21, 42 (2005) (emphasis added).

automatically render that activity integral and indispensable to an employee's principal work activities, and thus compensable. See Integrity Staffing, 135 S. Ct. at 519; Tyson Foods, 350 Wis. 2d 380, ¶26. Both cases declare that an activity is integral and indispensable to the principal activities if it is an intrinsic element with which the employee cannot dispense if he or she is to perform the employee's principal activities.[33] Integrity Staffing does not contradict Tyson Foods; Tyson Foods remains good law.

¶72 Another recent United States Supreme Court decision, Sandifer v. United States Steel Corp., 134 S. Ct. 870 (2014), discusses the issue of compensation for donning and doffing.

¶73 In Sandifer, employees were required to wear special clothing and protective equipment and devices because of the hazards at steel plants.[34] The statutory provision interpreted in Sandifer was 29 U.S.C. § 203(o).[35] Section 203(o) provides that the compensability of time spent "changing clothes or washing at the beginning or end of each workday" is a subject

---

[33] Integrity Staffing, 135 S. Ct. at 519 ("[A]n activity is integral and indispensable to the principal activities . . . if it is an intrinsic element . . . with which the employee cannot dispense if he is to perform his principal activities."); Tyson Foods, 350 Wis. 2d 380, ¶26 ("An integral part of a principal activity includes . . . an activity that is . . . indispensable to its performance.").

[34] Sandifer, 134 S. Ct. at 874.

[35] Sandifer, 134 S. Ct. at 874.

appropriately committed to collective bargaining.[36]  U.S. Steel, the defendant, contended that the provision in the collective bargaining agreement rendering noncompensable the time spent donning and doffing the special clothing and protective equipment and devices was a valid provision under 29 U.S.C. § 203(o).[37]

¶74 According to the Sandifer Court, the exception for collective bargaining agreements in 29 U.S.C. § 203(o) applies only when "changing clothes" is "'an integral and indispensable part of the principal activities for which covered workmen are employed.'"[38]  U.S. Steel did not dispute the Seventh Circuit's conclusion that were it not for 29 U.S.C. § 203(o) and the collective bargaining agreement, the time spent donning and doffing the special clothing and protective equipment and devices would have been integral and indispensable to the principal activities for which the employees were employed.[39] Thus, the time would have been compensable.

¶75 Analyzing dictionary definitions of the statutory terms "change" and "clothes," the Sandifer Court concluded the time spent putting on and taking off the special clothing and

---

[36] 29 U.S.C. § 203(o) (emphasis added).

[37] Sandifer, 134 S. Ct. at 874.

[38] Sandifer, 134 S. Ct. at 877 (quoting Steiner v. Mitchell, 350 U.S. 247, 256 (1956)).

[39] Sandifer, 134 S. Ct. at 876 (quoting Sandifer v. U.S. Steel Corp., 678 F.3d 590, 596 (7th Cir. 2012)).

protective equipment and devices was, on the whole, time spent "changing clothes" under 29 U.S.C. § 203(o).[40] As a result, the time spent donning and doffing was not compensable under 29 U.S.C. § 203(o) and the collective bargaining agreement.[41]

¶76 No counterpart to 29 U.S.C. § 203(o) exists in Wisconsin law. Although the clothing and protective equipment and devices at issue in Sandifer were more specialized than those at issue in the instant case, the Sandifer case supports the conclusion that the clothing and equipment at issue in the instant case is integral and indispensable to the employees' principal work activities.

¶77 Moreover, although Hormel and the Union have entered into a collective bargaining agreement, the agreement does not speak to the compensability of time spent donning and doffing the required clothing and equipment.

¶78 Applying Tyson Foods, Integrity Staffing, and Sandifer, we conclude that donning and doffing the clothing and equipment at the beginning and end of the day in the instant case is "integral and indispensable" to the employees' principal activities of producing food products. Accordingly, we affirm the circuit court's judgment and order that the employees should be compensated for the 5.7 minutes per day spent donning and

---

[40] Sandifer, 134 S. Ct. at 876-79.

[41] Sandifer, 134 S. Ct. at 879.

27

doffing the required clothing and equipment at the beginning and end of the day under Wis. Admin. Code § DWD 272.12.

IV

¶79 We next examine whether the time spent donning and doffing Hormel's required clothing and equipment during meal periods is considered compensable work time.

¶80 Hormel does not pay the employees for their 30-minute meal period.

¶81 In the circuit court, the Union argued that the unpaid meal periods were compensable under two regulations. First, Wis. Admin. Code § DWD 272.12(2)(c), which applies to "[r]est and meal periods." Second, Wis. Admin. Code § DWD 274.02(3), which provides the test for when a meal period is "on-duty," and thus counted as compensable work time.[42]

¶82 We will address the applicable regulations, Wis. Admin. Code §§ DWD 272.12(2)(c) and 274.02(3), in turn.

¶83 First, Wis. Admin. Code § DWD 272.12(2)(c)2. provides that "[b]ona fide meal periods of 30 minutes or more are not

---

[42] Although the concurrence/dissent concludes that the unpaid meal periods are not compensable, the concurrence/dissent cites only one of these regulations, Wis. Admin. Code § DWD 274.02(3). See concurrence/dissent, ¶119 n.8. Instead, the concurrence/dissent analyzes whether leaving the facility during a meal period is a "principal activity" under Wis. Admin. Code § DWD 272.12(2)(e). See concurrence/dissent, ¶¶122-124.

The "principal activity" analysis under Wis. Admin. Code § DWD 272.12(2)(e) applies to "[p]reparatory and concluding activities." Meal periods are not generally viewed as "[p]reparatory and concluding activities."

work time. . . . The employee must be completely relieved from duty for the purposes of eating regular meals. . . . The employee is not relieved if they are required to perform any duties, whether active or inactive, while eating."

¶84 Second, Wis. Admin Code § DWD 274.02(3) states that "[t]he employer shall pay all employees for on-duty meal periods, which are to be counted as work time. An on-duty meal period is a meal period where the employer does not provide at least 30 minutes free from work. Any meal period where the employee is not free to leave the premises of the employer will also be considered an on-duty meal period."

¶85 The circuit court declared that the required donning and doffing of clothing and equipment to leave the Hormel plant during the 30-minute meal periods denied employees a bona fide 30-minute meal period in violation of Wisconsin law. Nevertheless, the circuit court refused to award damages for employees who remained on site during the meal period. The circuit court did not adopt the Union's position that the employees were to be reimbursed for the alleged lost 30-minute meal break when the employees did not leave the premises but simply sat in the lunch room for 30 minutes and ate their meal.

The circuit court labeled the Union's contention far too broad in its scope and found it was unsupported by credible evidence.[43]

¶86 As the circuit court acknowledged, "evidence about the lunch period was sparse." The circuit court apparently agreed with Hormel's position that even if liability were found for the unpaid meal period, damages could be awarded only to the employees who left the premises during the meals period. The circuit court accepted the evidence that 1% of the employees donned and doffed the clothing and equipment and left the premises for meals. The parties stipulated that if the circuit court accepted the 1% evidence, the damages on the unpaid meal period claim would be $15,000.

¶87 The parties explained in the stipulation that the stipulation was entered to limit the issues and expedite the trial. Neither party took any opportunity at the circuit court or thereafter to challenge the circuit court's $15,000 damage award.

¶88 In this court, neither Hormel nor the Union made any arguments specifically regarding the compensability of the

---

[43] The Union argued that because Hormel's work rules required the employees to don and doff their clothing and equipment to leave the facility during their meal periods, the vast majority of employees chose to remain on site during their meal periods. The circuit court referred to this as the Union's "chilling effect" argument, and concluded it was unsupported by any credible evidence. If the circuit court had accepted the Union's "chilling effect" argument, damages would have been about $1.5 million.

unpaid meal periods. They merely discussed the meal periods in stating the background of the dispute.

¶89 Hormel's counsel never discussed the compensability of the unpaid meal periods in his briefs to the court of appeals or this court or in oral argument.

¶90 As the concurrence/dissent points out, the Union's counsel did responded to several questions from the court at oral argument regarding the compensability of unpaid meal periods. However, the Union's counsel did not, as the concurrence/dissent contends, "renew" any claim for compensation for unpaid meal periods aside from defending the circuit court's $15,000 damage award for the 1% of the employees who left the premises for meals.[44] As the excerpts of oral argument quoted in the concurrence/dissent show, the Union's counsel was "not asking for pay for the other 99%" of the employees.[45]

¶91 Instead, Hormel's and the Union's arguments to both this court and the court of appeals addressed only the circuit court's determination that 5.7 minutes spent per day donning and doffing the required clothing and equipment is "integral and indispensable" to the employees' principal work activities of food production.

¶92 As explained previously, we affirm the circuit court's conclusion that the 5.7 minutes spent per day donning and

---

[44] See concurrence/dissent, ¶119.

[45] Concurrence/dissent, ¶120.

doffing the required clothing and equipment is integral and indispensable to the employees' principal work activities.

¶93  We do not affirm the circuit court's declaration that the required donning and doffing of clothing and equipment to leave the Hormel plant during the 30-minute meal periods denied employees a bona fide 30-minute meal period in violation of Wisconsin law.  We accept the $15,000 damage award because the parties accepted it and have not disputed it in this court.[46]

¶94  The circuit court's awarding $15,000 based on the parties' stipulation appears to be an attempt by the circuit court and the parties to efficiently resolve this dispute without a definitive ruling on the meal period.  The parties were trying to limit the issues and expedite the trial on the issue of donning and doffing the Hormel-required clothing and equipment at the beginning and end of the day.  In the absence of evidence and argument, we, like the circuit court, will not disturb the $15,000 accommodation between the parties.

V

¶95  Having determined that the donning and doffing at the beginning and end of the day is integral and indispensable to the employees' principal activities in producing food products, we next address whether this time is non-compensable under the

---

[46] See Maurin v. Hall, 2004 WI 100, ¶120, 274 Wis. 2d 28, 682 N.W.2d 866 (Abrahamson, C.J., & Crooks, J., concurring) ("The rule of law is generally best developed when matters are tested by the fire of adversarial briefs and oral argument), overruled on other grounds by Bartholomew v. Wis. Patients Comp. Fund, 2006 WI 91, 293 Wis. 2d 38, 717 N.W.2d 216

doctrine of de minimis non curat lex (the law does not concern itself with trifles).

¶96 The circuit court and Hormel viewed Hormel as having the burden of proof on the issue of the de minimis non curat lex doctrine. The circuit court determined that "Hormel has failed to carry its burden to show the applicability of the de minimis doctrine, and, therefore, that doctrine is not controlling (assuming it exists at all in Wisconsin law)."

¶97 The de minimis non curat lex doctrine "permits employers to disregard . . . otherwise compensable work '[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours.'" Singh v. City of New York, 524 F.3d 361, 370 (2d Cir. 2008) (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 692 (1946)).[47]

¶98 Assuming, without deciding, that the de minimis doctrine is applicable to claims under Wis. Admin. Code § DWD 272.12, we conclude that in the instant case, the de minimis doctrine does not bar compensation for the time spent donning and doffing the required clothing and equipment because the time spent donning and doffing is not a "trifle."

---

[47] The Sandifer court remarked (in the context of 29 U.S.C. § 209(o)) that "[a] de minimis doctrine does not fit comfortably within the statute at issue here, which, it can fairly be said, is all about trifles——the relatively insignificant periods of time in which employees wash up and put on various items of clothing needed for their jobs." Sandifer, 134 S. Ct. at 880.

¶99 Although the de minimis non curat lex doctrine is an established feature of the Federal Fair Labor Standards Act,[48] no Wisconsin cases, statutes, or regulations state that the de minimis doctrine applies to Wisconsin DWD regulations or in employment disputes.  Wisconsin courts have, however, applied the doctrine in other unrelated contexts.  See, e.g., Town of Delevan v. City of Delevan, 176 Wis. 2d 516, 532, 500 N.W.2d 268 (1993) (annexation); Waupaca Cnty. v. Bax, No. 2009AP1406, unpublished slip op. (Wis. Ct. App. Jan. 28, 2010) (zoning).

¶100 Despite the lack of Wisconsin case law or state statutory guidance with regard to the de minimis doctrine in the instant case, a review of federal case law assists in reaching our conclusions.

¶101 As Hormel noted, the United States Supreme Court first applied the maxim of de minimis non curat lex as a possible defense to disputes originating under the Federal Labor Standards Act in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946).  The United States Supreme Court stated that overtime compensation that concerns "only a few seconds or minutes of work" may be disregarded as de minimis, reasoning that "[s]plit-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act."  Anderson, 328 U.S. at 692.  The de minimis doctrine appears in the federal regulations.  See 29

---

[48] Tyson Foods, 350 Wis. 2d 380, ¶51.

C.F.R. § 785.47. In contrast to federal law, the de minimis doctrine has no explicit basis in the Wisconsin statutes or Wisconsin regulations in the instant case.

¶102 In the instant case, employees spend approximately 24 hours per year donning and doffing. Viewed in light of the employees' hourly rate of $22 per hour, the unpaid period in question may amount to over $500 per year for each employee and substantial sums for Hormel. We agree with the circuit court that in the instant case this time is not a "trifle."

¶103 Hormel's primary reliance on Mitchell v. JCG Industries, Inc., 745 F.3d 837 (7th Cir. 2014), is misplaced. In Mitchell, the Seventh Circuit held the de minimis doctrine applicable to donning and doffing during a meal break. Mitchell, 745 F.3d at 841-42. After discussing the parties' disagreement regarding the amount of time spent donning and doffing equipment, the federal court of appeals quoted the Supreme Court in Sandifer v. U.S. Steel Corp., 134 S. Ct. 870, 881 (2014), that "it is most unlikely Congress meant § 203(o) to convert federal judges into time-study professionals." Mitchell, 745 F.3d at 843 (quoting Sandifer, 134 S. Ct. at 881). Thus, the Seventh Circuit held that under the de minimis doctrine, it was better to leave to collective bargaining, rather than judicial determination, the issue of how much time was spent donning and doffing equipment on different days. Mitchell, 745 F.3d at 843.

¶104 Here, Hormel and the Union stipulated to the donning and doffing period in question at the beginning and end of the

35

day:   5.7 minutes per day, 28.5 minutes per week, approximately 24 hours per year.  As a result, in the instant case the court need not be a "time-study professional" to determine the time spent donning and doffing the clothing and equipment.

¶105 Assuming, without deciding, that the <u>de minimis</u> doctrine applies to claims arising under Wis. Admin. Code § DWD 272.12, the <u>de minimis</u> doctrine does not bar compensation for the time spent donning and doffing the required clothing and equipment at the beginning and end of the day because the time spent donning and doffing is not a "trifle."  The donning and doffing of the clothing and equipment at the beginning and end of the day is integral and indispensable to the employees' principal activity——to successfully and sanitarily produce Hormel's products.  Viewed in the aggregate, this time amounts to over $500 per year for each employee, a figure that is certainly significant to an employee and to Hormel. Accordingly, we conclude that the period spent donning and doffing at the beginning and end of the day is compensable under Wis. Admin. Code § DWD 272.12 and affirm the judgment and order of the circuit court.

¶106 For the reasons set forth, we conclude:

> (1)  Wisconsin Admin. Code § DWD 272.12 requires Hormel to compensate its employees for the 5.7 minutes per day spent donning and doffing the clothing and equipment at the beginning and end of the day.  Relying on <u>Tyson Foods</u>, 350 Wis. 2d 380, as did the circuit court, we conclude, as

did the circuit court, that the employees' donning and doffing clothing and equipment at the beginning and end of the day brought Hormel into compliance with federal food and safety regulations and was integral to sanitation and safety in the employees' principal activities, namely food production.

(2) The required donning and doffing of clothing and equipment at the beginning and end of the day does not fall within the doctrine of de minimis non curat lex. The wages involved are not a "trifle" either for the employees or Hormel.

*By the Court*.-The judgment and order of the circuit court is affirmed.

¶107 REBECCA G. BRADLEY, J., did not participate.

¶108 PATIENCE DRAKE ROGGENSACK, C.J. *(concurring in part, dissenting in part).* While I do not join the lead opinion,[1] I agree with its conclusion that donning and doffing of company-required clothing and gear at the beginning and end of the workday is "an integral part of a principal activity" of Hormel Foods Corporation for which compensation is required.[2] I also agree that under the facts of this case Hormel is not relieved of its obligation to compensate for 5.7 minutes per day for those tasks by the de minimis rule.[3]

¶109 I dissent from the lead opinion because I conclude that Hormel is not required to further compensate its employees due to doffing and donning by employees who choose to leave the workplace for lunch. Leaving during the lunch break serves no interest of Hormel, is not "an integral part of a principal activity" of the employer within the meaning of Wis. Admin. Code § DWD 272.12(2)(e)1. (2009), and serves only employees' interests. I also dissent because I would cabin the time for which compensation is due each employee at 5.7 minutes per workday. That is the total time presented to us as a stipulation by the parties for an employee to accomplish donning and doffing at the beginning and end of a workday. If the time allocated for donning and doffing were not cabined at a

---

[1] The lead opinion represents the decision of two justices: Justice Shirley S. Abrahamson and Justice Ann Walsh Bradley.

[2] Lead op., ¶7.

[3] Id. at ¶8.

specified number of minutes per employee per workday, the de minimis rule would preclude compensation because keeping accurate payroll records of the varying time that each employee spends donning and doffing on each workday would appear to be a nearly impossible administrative task for Hormel. Cabining the time at a specified number of minutes per employee per workday for which compensation is due was the mode employed in prior contracts between Hormel and the Union for those tasks. Accordingly, I respectfully concur in part and dissent in part from the lead opinion.

## I. BACKGROUND

¶110 The lead opinion ably sets out facts as presented by the parties, who do not dispute what occurred on a factual basis. I repeat only a few facts here to draw the reader into the discussion that follows.

¶111 This is a wage and hour claim against Hormel, whose business is food production. Hormel's Beloit plant has assembly-line food preparation where raw materials enter the facility and move through a production-line process where meat, seasonings and other ingredients are ground, chopped and prepared for cooking and canning. During part of the food preparation, product ingredients are in open containers as employees work to prepare and cook various raw materials. The production process of food products ends when high temperature, heavy pressure canning occurs.

¶112 The claim here arises because Hormel requires employees to wear Hormel-provided clothing, "whites," and

2

protective gear, such as glasses, hair and beard nets, and hard hats, while working and to remove the whites and gear before they leave Hormel's facility.[4] When employees choose to leave Hormel's facility during the 30-minute lunch break, they are required to doff their whites and gear and to don them again before they return to food preparation.

¶113 Hormel is not currently compensating employees for donning and doffing. However, in an earlier union contract, Hormel compensated employees 12 minutes per day for these tasks.[5] During subsequent contract negotiations, the Union bargained away this compensation provision.[6]

¶114 The parties stipulated that 5.7 minutes is the total average time per day an employee requires to don and doff whites and gear at the beginning and end of the workday. The questions presented to us are four-fold: (1) whether donning and doffing of clothing and gear that Hormel requires employees to put on at the start of the workday and remove before they leave the workplace is time worked for which compensation is due under

_____

[4] For convenience, I refer to the clothing provided by Hormel as "whites," even though some employees are required to wear clothing that is blue in color.

[5] The record reflects that in the 1980s employees were compensated 12 minutes per day for donning and doffing under the then union contract.

[6] Hormel does not argue that no compensation is due because such compensation was bargained away in a collective bargaining agreement, which is permitted under state and federal law. See Aguilar v. Husco Int'l, Inc., 2015 WI 36, ¶24, 361 Wis. 2d 597, 863 N.W.2d 556; Wis. Admin. Code § DWD 274.05; see also Sandifer v. United States Steel Corp., 134 S. Ct. 870, 878-79 (2014).

3

Wisconsin law; (2) whether doffing and donning of clothing and equipment that occurs when employees choose to leave during the 30-minute lunch break is time worked for which compensation is due under Wisconsin law; (3) whether Hormel is relieved from compensating its employees for donning and doffing by the de minimis rule; and (4) if the de minimis rule does not apply, what is the amount of time for which compensation is due for past, and will be due for future, donning and doffing.

## II. DISCUSSION

### A. Standard of Review

¶115 To decide the questions presented, we must interpret Wisconsin Administrative Code provisions, most specifically, Wis. Admin. Code § DWD 272.12(2)(e)1., as it drives the determination of "hours worked" by Hormel employees. In that regard, whether donning and doffing are "an integral part of a principal activity" of the employer within the meaning of § DWD 272.12(2)(e)1. is a question of law that we review independently. DaimlerChrysler v. LIRC, 2007 WI 15, ¶10, 299 Wis. 2d 1, 727 N.W.2d 311.

¶116 If Wis. Admin. Code § DWD 272.12(2)(e)1. applies to donning and doffing, whether the de minimis rule nevertheless precludes Hormel employees' recovery for otherwise compensable time is also a question of law for our independent review. Lindow v. United States, 738 F.2d 1057, 1062 (9th Cir. 1984).

4

B.  Section DWD 272.12(2)(e)1.

1.  Beginning and end of workday

¶117 If donning and doffing come within Wis. Admin. Code § DWD 272.12(2)(e)1., those tasks are part of the hours worked for which compensation is due because they are part of the "Workday."  § DWD 272.12(1)(a)2.  I agree with the lead opinion's conclusion that § DWD 272.12(2)(e)1. requires Hormel to compensate its employees for 5.7 minutes per day that have been cabined for donning and doffing clothing and equipment at the beginning and end of the workday.[7]  I agree because a principal activity of Hormel is sanitary food production and Hormel's requirement that employees wear clean whites, hair nets, beard nets and other equipment designed to keep foreign objects out of the food is an integral part of the production of sanitary food.  See § DWD 272.12(2)(e)1.c.  As the court of appeals correctly reasoned in regard to Weissman's claim for donning required clothing and gear at the start of the workday and doffing at day's conclusion, "donning and doffing here constitute 'preparatory and concluding' activities that are 'an integral part of a principal activity'" of the employer, again sanitary food production.  Weissman v. Tyson Prepared Foods, Inc., 2013 WI App 109, ¶2, 350 Wis. 2d 380, 838 N.W.2d 502.

2.  Lunch break

¶118 The circuit court granted compensation for doffing and donning clothing and gear for those employees who chose to leave

---

[7] See lead op., ¶7.

Hormel's facility during their lunch break. The Union had asked for 30 minutes of additional compensation because it claimed that doffing and donning in order to leave the workplace during lunch break caused the break to be less than 30 minutes long and therefore compensation for the full 30 minutes was due.

¶119 Before us, the Union renews its claim that compensation is due for an additional 30 minutes because the time required for doffing and donning that occurs when employees choose to leave the workplace reduces the lunch break to less than 30 minutes, the minimum time required for an unpaid break.[8] The lead opinion affirms the circuit court, and ducks the question presented about the compensability of the doffing and donning during the lunch break by asserting, "neither Hormel nor the Union made any arguments specifically regarding the compensability of the unpaid meal periods."[9]

¶120 The lead opinion minimizes what occurred at oral argument before us. For example, the following questions were asked and answered:

> CHIEF JUSTICE ROGGENSACK: Part of your brief was people wanting to leave the workplace for 30 minutes, and in order to do so they have to take off the clothes that they're required to put on when they go out to lunch and put them back on again when they come in from lunch, correct?
>
> UNION COUNSEL: Yes.

---

[8] See Wis. Admin. Code § DWD 274.02(3) (2013).

[9] Lead op., ¶88.

6

CHIEF JUSTICE ROGGENSACK: Are you asking for compensation for that in addition to the beginning of the workday and the end of the workday for anybody who leaves the place of employment?

UNION COUNSEL: Well the trial court looked at that and the regulations again are clear. That if there is not a 30 minute uninterrupted break, it has to be paid for. So the issue is, since people are required to don before they leave the plant and doff before they, when they come back, they are actually getting less than a 30-minute lunch.

CHIEF JUSTICE ROGGENSACK: Okay so the answer to my question is "yes?"

UNION COUNSEL: They should be paid for the lunchtime. And the court found that approximately 1% of the workers do that. So we're not asking for pay for the other 99%.

. . . .

JUSTICE A.W. BRADLEY: I'm focusing on the lunch hour, the 30 minutes. Our opinions have to make sense . . . . This doesn't make sense to me. If we would agree with the trial court that the donning and doffing for some employees who do this over the 30-minute lunch hour should be compensable, what, doesn't that provide an incentive for . . . more, maybe all of the employees to say "oh let's get time and a half, let's put on and take off over the 30-minute lunch hour?" That doesn't make sense to me. It sounds like it will be giving a rather perverse incentive. Now, so tell me why it does make sense. Tell me why, since it only affects a few, according to the record, a few employees, that shouldn't be considered de minimis. So you've got two questions there.

UNION COUNSEL: Well, again, it's only if, just factually, if you're leaving the plant that you're entitled to that pay. [Justice A.W. Bradley interjects]. I think the exact same test is being applied. So, if you find that donning and doffing the clothes is compensable in the morning and in the afternoon where employers are required because it is integral and indispensable, the exact same argument makes exact same sense because of the regulation that requires a bona fide meal period of 30 minutes. So

7

Hormel would be required to allow employees to take a full 30-minute lunch, which includes being able to don first, then leave the plant, then come back 30 minutes later, and then——or doff first——and then don on the way back in.

JUSTICE A.W. BRADLEY: So you're not really responding to my concern about the potential for gaming the law?

UNION COUNSEL: I don't see how it's gaming because the legislature has said that the Department of Workforce Development has to pass these regulations, and they have. They've said that everyone is entitled to a 30-minute bona fide meal period.

. . . .

JUSTICE ABRAHAMSON: Does the 5.7 minutes include the initial putting them on and the final taking them off and the lunch hour donning and doffing?

UNION COUNSEL: No.

JUSTICE ABRAHAMSON: So it only deals with putting them on to begin with and taking them off, right?

UNION COUNSEL: Right.

JUSTICE ABRAHAMSON: But the trial court order says . . . that the class members have been denied the right to 30 minutes off duty to leave the premises and the doffing and donning clothes and gear during such 30 minutes violates the class members. So the declaratory judgment is that's a violation.

UNION COUNSEL: Right . . . yes.

¶121 I conclude the reasoning that supports the conclusion that donning and doffing at the beginning and end of the workday are "an integral part of a principal activity" of Hormel and therefore require compensation does not support compensation for doffing and donning when employees choose to leave Hormel's facility during their lunch break, nor does it support 30 minutes more pay because time required to doff and don reduces the lunch break below 30 minutes.

8

¶122 First, no interest or activity of Hormel is served by employees leaving its facility during lunch break. Stated otherwise, leaving Hormel's facility at lunch does not aid in sanitary food production, which is a principal activity of Hormel. Second, the choice to leave Hormel's facility at lunch is totally each individual employee's choice, not Hormel's.

¶123 Wisconsin Admin. Code § DWD 272.12(2)(e)1. is directed at "a principal activity" of the employer, Hormel. It is § DWD 272.12(2)(e)1. that drives the obligation to compensate employees for the initial donning and final doffing of whites and gear. Section DWD 272.12(2)(e)1. is not directed at principal activities of employees. However, leaving the workplace during lunch break is driven by principal activities of employees, i.e., employees choose to leave to further their own interests. Furthermore, approximately 1% of employees choose to leave during lunch break. With 99% of employees not undertaking an activity, that activity cannot reasonably be contended to constitute a "principal activity" of the employer. Instead, the 1% of employees is furthering their own principal activity, i.e., their choice to leave for lunch. Section DWD 272.12(2)(e)1. does not require compensation for principal activities of employees.

¶124 And finally, while employees are free to leave the workplace during lunch break, it is their personal and voluntary choice that causes them to leave Hormel's facility. Their leaving serves no interest of Hormel. Accordingly, I conclude that Hormel is not required to compensate employees who leave

9

the workplace for their entire lunch break, as the Union requests, or for a portion thereof, as the circuit court ordered. Therefore, I would reverse the order of the circuit court in regard to payment for lunchtime doffing and donning, which order the lead opinion does not overturn.[10]

### C. De Minimis Rule

¶125 Hormel contends that all donning and doffing should fall outside of its obligation to provide compensation because of the de minimis rule. The lead opinion concludes that donning and doffing at the beginning and end of the workday are not de minimis, assuming that the de minimis rule may be applied to the Union's claims.[11] The lead opinion does not discuss whether the de minimis rule may be applied to doffing and donning by those employees who choose to leave during their lunch break.

¶126 The United States Supreme Court discussed application of the de minimis rule in regard to a federal wage and hour claim in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946). There, the Court said that work "pursued necessarily and primarily for the benefit of the employer and his business" and rightly included in "the statutory workweek" may nevertheless go without payment if it is de minimis. Id. at 691-92 (citation omitted).

---

[10] Because four justices, Chief Justice Roggensack, Justice Prosser, Justice Ziegler and Justice Gableman, conclude that no compensation is due for doffing and donning during lunch break, the order of the circuit court is reversed in regard to the $15,000 payment that the circuit court ordered.

[11] Id., ¶¶8, 98.

10

¶127 To determine whether the de minimis rule applies in a particular context, one must consider whether the factual predicates for the rule's application are met. In Lindow, the Ninth Circuit Court of Appeals carefully explained a test that it applied when considering whether compensation is excused that otherwise would be due because the work is de minimis. There, employees of the Army Corps of Engineers (Corps) sought overtime compensation for the Corps' requirement that they report to work 15 minutes before the start of their scheduled shifts to perform certain tasks that took part of the required 15 minutes. Lindow, 738 F.2d at 1059.

¶128 Lindow explained that the "de minimis rule is concerned with the practical administrative difficulty of recording small amounts of time for payroll purposes." Id. at 1062. The court reasoned that keeping accurate track of varying, small amounts of time for many employees could be an overwhelming task for employers. Id. at 1063 (citing Veech & Moon, De Minimis Non Curat Lex, 45 Mich. L. Rev. 537, 551 (1947) and its conclusion that Anderson was concerned with "just plain everyday practicality").

¶129 Lindow also explained that an "important factor in determining whether a claim is de minimis is the amount of daily time spent on the additional work[,] . . . [although n]o rigid rule can be applied with mathematical certainty." Id. at 1062 (citing Frank v. Wilson & Co., 172 F.2d 712, 716 (7th Cir. 1949) and Nardone v. Gen. Motors, Inc., 207 F. Supp. 336, 341 (D.N.J. 1962)). Further, the court considered the "size of the

11

aggregate claim" for those claims where time expended may have been minimal on a daily basis. Id. at 1063. And finally, Lindow noted that "in applying the de minimis rule, we will consider whether the claimants performed the work on a regular basis." Id. (citing Smith v. Cleveland Pneumatic Tool, Co., 173 F.2d 775, 776 (6th Cir. 1949), as applying de minimis rule where unpaid work did not occur on a daily basis).

¶130 I adopt and apply the Lindow test, summarizing it as follows: (1) the time at issue must be otherwise compensable by the employer and (2) consideration must be given to (a) the practical, administrative difficulty of accurately recording small amounts of additional time that may vary from employee to employee, (b) the regularity on which additional work is performed, (c) the time spent each day on additional work, and (d) the size of the aggregate claim for additional compensation. Id. at 1062-63.

¶131 In the case now before us, unless the de minimis rule applies, the cabined 5.7 minutes per day for donning whites and required gear at the beginning of the workday and doffing at the end of the workday is compensable because it is integral to a principal activity of Hormel. Weissman, 350 Wis. 2d 380, ¶2. However, because doffing and donning by those employees who choose to leave during lunch break is not compensable, the de minimis rule has no application there. Anderson, 328 U.S. at 691-92; Lindow, 738 F.2d at 1063.

¶132 As I apply the Lindow test to determine whether the de minimis rule eliminates Hormel's obligation for compensation of

12

the stipulated total time of 5.7 minutes per day for donning at the beginning of the workday and doffing at the end of the workday, I note that if Hormel were required to record for payroll purposes the varying amounts of time that each individual employee expends to don and doff at the beginning and end of each workday, it would appear to be almost an administrative impossibility to do so accurately. Furthermore, imposing such an obligation on Hormel could lead to an unending series of wage and hour claims by employees who contend that Hormel did not record the correct amount of time on particular days for particular employees. Stated otherwise, if the total time per day that is due for donning and doffing were not cabined at a stipulated amount, all donning and doffing would be precluded by the de minimis rule.

¶133 Other courts have used the de minimis rule to eliminate otherwise compensable time that was too burdensome to record accurately. See Mitchell v. JCG Indus., Inc., 745 F.3d 837, 843 (7th Cir. 2014) (precluding an obligation to record small, varying amounts of time for payroll purposes in part because it would turn judges into "time-study professionals" when complaints about accuracy of recording were made).

¶134 However, as the claim is presented to us, the Union and Hormel have cabined the total time taken to don and doff at the beginning and end of a workday at 5.7 minutes per employee. In addition, the Union has not requested that we impose an obligation on Hormel to record for payroll purposes the actual time spent by each employee on each day.

13

¶135 The Union's approach of seeking recovery for an agreed amount of compensable time on a daily basis is consistent with the approach the Union took when donning and doffing were accorded in collective bargaining.[12] It also frees Hormel from what would be a near administrative impossibility to do accurately.

¶136 I note that the tasks for which compensation is required occur on a daily basis for each employee engaged in food preparation. In addition, although 5.7 minutes per day is a small amount of time, because it is expended every day, the aggregate amount of each employee's claim per year is $500, which is significant. It is also significant to Hormel as an aggregate amount for all food preparation employees.

¶137 Accordingly, I conclude that in the context presented by the case at hand, the de minimis rule does not apply to preclude compensation for 5.7 minutes per day for each food preparation employee who dons whites and required gear at the start of the workday and doffs them at the day's conclusion.

D. Cabining Time Allotted

¶138 If the lead opinion were construed as leaving the amount of donning and doffing time open to adjustment for future work days, I could not concur with the lead opinion in any respect. This is so because without cabining the time at a specified number of minutes per employee per day for which compensation is due, the entire claim would be precluded by the

---

[12] See note 5, supra.

near impossibility of Hormel's accurately recording small, varying amounts of time for payroll purposes for each employee. However, with compensable time cabined at a stipulated amount, Hormel knows what compensation is due for past work. Hormel also can choose to compensate through shortening future workdays by 5.7 minutes so that it is not put in the position of exceeding a 40-hour work week in the future. Accordingly, cabining the time allotted for which compensation is due is necessary to my decision to agree with the lead opinion in part.

### III. CONCLUSION

¶139 While I do not join the lead opinion, I agree with its conclusion that donning and doffing of company-required clothing and gear at the beginning and end of the workday is "an integral part of a principal activity" of Hormel for which compensation is required. I also agree that under the facts of this case Hormel is not relieved of its obligation to compensate for 5.7 minutes per day for those tasks by the de minimis rule.

¶140 I dissent from the lead opinion because I conclude that Hormel is not required to further compensate its employees due to doffing and donning by employees who choose to leave the workplace for lunch. Leaving during the lunch break serves no interest of Hormel, is not "an integral part of a principal activity" of the employer within the meaning of Wis. Admin. Code § DWD 272.12(2)(e)1 and serves only employees' interests. I also dissent because I would cabin the time for which compensation is due each employee at 5.7 minutes per workday. That is the total time presented to us as a stipulation by the

15

parties for an employee to accomplish donning and doffing at the beginning and end of a workday. If the time allocated for donning and doffing were not cabined at a specified number of minutes per employee per workday, the de minimis rule would preclude compensation because keeping accurate records of the varying time that each employee spends donning and doffing on each workday would be a nearly impossible administrative task for Hormel. Cabining the time at a specified number of minutes per employee per workday for which compensation is due was the mode employed in prior contracts between Hormel and the Union for those tasks. Accordingly, I respectfully concur in part and dissent in part from the lead opinion.

¶141 I am authorized to state that Justice DAVID T. PROSSER, JR. joins this opinion.

16

¶142 MICHAEL J. GABLEMAN, J. *(dissenting).* I agree with the lead opinion's and the concurring/dissenting opinion's conclusion that Weissman v. Tyson Foods, Inc., 2013 WI App 109, 350 Wis. 2d 380, 838 N.W.2d 502, review granted, 2014 WI 3, 352 Wis. 2d 351, 842 N.W.2d 359, need not be overruled. However, I do not agree with the lead opinion's and the concurring/dissenting opinion's conclusion that Hormel must compensate its employees for the time they spend "donning and doffing" company-required "whites" at the Beloit cannery. Unlike a majority of this court, I conclude that the "donning and doffing" of the "whites" in this case is not "integral and indispensable" to the employees' principal work activity of canning food.

¶143 Because an "integral and indispensable" analysis is context-specific, I begin by laying out the facts of the present case.[1] I then take up the two issues before this court: (1) is

---

[1] This dissent often quotes information contained in the record. The information quoted is largely derived from trial testimony and the circuit court's opinion and order. Below is a list of individuals who testified at trial:

Scott A. Ramlo: Plant Manager at the Beloit cannery.

Pamela Collins: Quality Control, Weight, and Seam Technician at the Beloit cannery.

Charles Seeley: Production Specialist at the Beloit cannery.

Dennis Warne: Stork Operator at the Beloit cannery.

Resha Hovde: Corporate Manager of Regulatory Compliance and HAACP. HAACP stands for "hazard analysis critical control point."

(continued)

the "donning and doffing" of company-required "whites" compensable work time or non-compensable preliminary and postliminary activities under Wis. Admin. Code. § DWD 272.12(2)(e); and (2) if the time spent "donning and doffing" is otherwise compensable work time, is this time non-compensable under the doctrine of de minimis non curat lex?

## I. FACTUAL BACKGROUND

¶144 Hormel Foods Corporation ("Hormel") is a multi-national company specializing in food production. All the parties and the lead opinion agree that "Hormel is a fine employer with a quality record and a history of producing good, safe food for customers around the world." Lead op., ¶12.

¶145 Hormel has a variety of food producing plants located in different states. At every one of these plants, and without regard to what is being produced, Hormel requires its employees to "don and doff" either "whites" or "blues." Most employees wear "whites," but the maintenance department wears "blues." Every day Hormel employees "don and doff" hardhats, hearing protection, eye protection, hair nets, shoes,[2] and clean clothes. I use the term "whites" to refer to all of the above described items. Depending on the nature of the job, some employees "don and doff" additional clothing and gear on top of their "whites." Currently, Hormel's employees are not paid for the time it takes

---

Francisco Velaquez: Human Resource and Safety Manager at the Beloit cannery.

[2] Employees wear "captive" or "dedicated" shoes. Captive shoes are shoes that are left at the facility overnight.

to "don and doff" the "whites."[3] "Donning and doffing" the "whites" takes, at the median, 2.903 minutes per day. More specifically, "donning" the "whites" takes, at the median, 2 minutes, 3.84 seconds (or 2.064 minutes),[4] and "doffing" the

---

[3] The concurring/dissenting opinion correctly notes that in the 1980's Hormel compensated its employees 12 minutes per day for "donning and doffing" under a then-existing collective bargaining agreement ("CBA"). Concurrence/Dissent, ¶113. Eventually the compensation Hormel's employees received for "donning and doffing" was "bargained away." Id., ¶113 n.6.

The Wisconsin Administrative Code allows employees to bargain away rights they would otherwise have under the Code as long as the parties enter into a CBA agreement and apply for a waiver or otherwise meet the factors required for a waiver. See Wis. Admin. Code § DWD 247.05; Aguilar v. Husco Int'l, Inc., 2015 WI 36, ¶11, 361 Wis. 2d 597, 863 N.W.2d 556 ("[E]ven though the 20-minute unpaid breaks were technically violations of the code, it would be unreasonable to grant back pay because the breaks had posed no health or safety concerns, the statute permits waivers in circumstances such as these, and the employees had enjoyed other benefits in exchange for . . . the short unpaid meal periods.")

But, as the concurring/dissenting opinion points out, "Hormel does not argue that no compensation is due because such compensation was bargained away in a collective bargaining agreement, which is permitted under state and federal law." Concurrence/Dissent, ¶113 n.6.

[4] "Donning" a belt takes 16.740 seconds, "donning" ear plugs takes 6.960 seconds, "donning" a hair net takes 9.780 seconds, "donning" a hard hat takes 5.940 seconds, "donning" captive shoes takes 26.280 seconds, "donning" safety glasses takes 5.400 seconds, "donning" uniform pants takes 19.320 seconds, and "donning" a uniform shirt takes 18.780 seconds.

3

"whites" takes, at the median, 50.34 seconds (or .839 minutes).[5] "Donning and doffing" the "whites," washing hands,[6] and walking to an assigned work station takes,[7] at the median, 5.7 minutes per day.[8]

¶146 This case concerns only Hormel's Beloit cannery. The Beloit cannery employs approximately 290 people for various types of work ranging from quality control technician to forklift driver to sanitation crew member. The record reflects that only half of Hormel's employees at the Beloit cannery work near open product. Additionally, only half of the Beloit cannery has open product in it.

¶147 As a cannery, the Beloit facility is mainly tasked with preparing, canning, and shipping "shelf-stable" canned

---

[5] "Doffing" a belt takes 3.720 seconds, "doffing" ear plugs takes 1.980 seconds, "doffing" a hair net takes 4.860 seconds, "doffing" a hard hat takes 4.440 seconds, "doffing" captive shoes takes 14.640 seconds, "doffing" safety glasses takes 3.480 seconds, "doffing" uniform pants takes 10.800 seconds, and "doffing" a uniform shirt takes 6.420 seconds.

[6] Washing hands takes 14.640 seconds.

[7] The time it takes to walk to and from an employee's workstation varies depending on the location of the workstation. The shortest walk time to a workstation takes 27.66 seconds, and the shortest walk time from a workstation takes 26.16 seconds (for a total of 53.82 seconds per day). The longest walk time to a workstation takes 2 minutes, 19.56 seconds, and the longest walk time from a workstation takes 1 minute, 31.74 seconds (for a total of 3 minutes, 51.3 seconds per day).

[8] Attached to this dissent are time tables contained in the record. The tables show how long it takes to "don" and "doff" various items, to wash hands, and to walk to assigned workstations.

4

goods, including items such as Hormel Chili, Mary Kitchen Hash, and Chi-Chi's Salsa. This process is largely assembly like: outside suppliers deliver raw product in a receiving area; the product is cooked; the cooked product is placed into a can or glass container; and the canned product is sent through a final heating process. It is this final heating process, called "12-D cook" for canned products or "acidification" for glass products, that renders the product shelf-stable.

¶148 The 12-D cook and acidification processes are quite technical. For example, Resha Hovde, Hormel's corporate manager of regulatory compliance and HACCP, testified that Hormel's 12-D cook process

> provides a thermal destruction of organisms, of a trillion organisms. It's 12 to the 10th power. So if you could imagine a trillion organisms, and whatever product it is, it would destroy all the vegetative organisms . . . . So through time, an extensive amount of time at a high temperature, we're able to eliminate those organisms of concern.

In short, the 12-D cook and acidification processes "destroy any organisms of concern" such that any organism in the can or glass container "certainly wouldn't be a food safety issue."[9] No

---

[9] The following trial testimony emphasizes just how powerful the 12-D cook and acidification processes are:

> Q. Ms. Hovde, yesterday there was a hypothetical example that was posed to Mr. Ramlo, the plant manager at the Beloit facility, and it was regarding a world in which Hormel allows street clothes in the Beloit facility and doesn't require whites. Now in that world, according to the hypothetical, an avid fisherman who works at the Beloit facility would report to work with fish scales on his clothing and worms in his pockets. Based on the 12-D cook process

(continued)

employees come into contact with open product after the 12-D cook or acidification processes. The next time the product would come into contact with someone would be when a consumer opens the can.

¶149 As noted by the lead opinion, Hormel is subject to federal regulation by the United States Department of Agriculture (USDA), the United States Food and Drug Administration (FDA), and the federal Occupational Safety and Health Administration (OSHA). These regulations ensure that Hormel satisfies cleanliness, quality, and safety standards; however, these regulations "do not require these standards be satisfied in any particular manner." Lead op., ¶17. Instead, the regulations "generally speak to the point that [Hormel] need[s] [its] employees to be clean in a manner to prevent product adulteration or the general creation of unsanitary type conditions." Notably, the circuit court found,

---

you just described, what if those fish scales or those worms made their way into a can of Hormel product? Would they pose a threat to human safety?

A. I would argue that the heat process would destroy any organisms of concern.

Q. It might not be desirable to have those items in the can --

A. Correct.

Q. -- but it certainly wouldn't be a food safety issue?

A. Correct.

The USDA and FDA regulations do not require employees at the Beloit facility to wear whites. The USDA and FDA regulations do not specify who has to own or launder the clothing worn by the employees at the Beloit facility. Those regulations do not specify where the items have to be donned, doffed, and stored.

. . .

Hormel employees could wear street clothes at the Beloit facility and still comply with USDA and FDA regulations. USDA and FDA regulations do not require employees at the Beloit facility to keep their shoes within the facility. The use of captive or dedicated shoes is not the only method to avoid contamination at the Beloit plant. Hair covering is left to the company's discretion under the USDA and FDA regulations but the hair needs to be secured in a manner to prevent potential for product adulteration.

Thus, one way Hormel promotes cleanliness, quality, and safety is by having its employees "don and doff" the "whites." But this "donning and doffing" is not mandated by any regulation.

## II. THE "DONNING AND DOFFING" OF THE "WHITES" IS NOT COMPENSABLE WORK TIME UNDER THE CODE OR PRECEDENT.

### A. WISCONSIN ADMIN. CODE § DWD 272.12

¶150 To resolve this case, I must interpret and apply Wis. Admin. Code § DWD 272.12. Under Wis. Admin. Code § DWD 272.12(1)(a)1., employees "must be paid for all time spent in 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer's business.'" An employee's workweek "ordinarily includes 'all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace.'" Wis. Admin. Code § DWD 272.12(1)(a)1.

7

¶151 Compensable time is measured in terms of a "workday." According to Wis. Admin. Code § DWD 272.12(1)(a)2., the "'[w]orkday,' in general, means the period between 'the time on any particular workday at which such employee commences their principal activity or activities' and 'the time on any particular workday at which they cease such principal activity or activities.'" Activities that fall outside the workday are called "preliminary" or "postliminary" activities. See Wis. Admin. Code § DWD 272.12(2)(e)1.c. Pursuant to Wis. Admin. Code § DWD 272.12(2)(e), the "term 'principal activities' includes all activities which are an integral part of a principal activity." Moreover,

> [a]mong the activities included as an integral part of the principal activity are those closely related activities which are indispensable to its performance. If an employee in a chemical plant, for example, cannot perform their principal activities without putting on certain clothes, changing clothes on the employer's premises at the beginning and end of the workday would be an integral part of the employee's principal activity. . . .

Wis. Admin. Code § DWD 272.12(2)(e)1.c. (emphasis added).

¶152 To summarize, if the "donning and doffing" is a preliminary or postliminary activity, then it falls outside the workday and does not qualify as compensable work time. In contrast, if the "donning and doffing" is a principal activity, then it falls within the workday and qualifies as compensable work time. Principal activities include those activities that are an "integral and indispensable" part of a principal activity.

8

B. PRECEDENT: <u>WEISSMAN v. TYSON FOODS</u>, <u>INTEGRITY STAFFING SOLUTIONS, INC. v. BUSK</u>, <u>STEINER v. MITCHELL</u>, AND <u>MITCHELL v. KING PACKING CO.</u>

¶153 In addition to interpreting and applying the pertinent portions of Wis. Admin. Code § DWD 272.12, I also look to applicable case law as a guide for determining when an activity is "integral and indispensable." Four cases, one from the court of appeals and three from the Supreme Court of the United States are particularly relevant; thus, a brief recitation of the facts and holdings of each case is appropriate.

¶154 In <u>Weissman v. Tyson Foods, Inc.</u>, 2013 WI App 109, 350 Wis. 2d 380, 838 N.W.2d 502, <u>review granted</u>, 2014 WI 3, 352 Wis. 2d 351, 842 N.W.2d 359,[10] the court of appeals considered whether the "donning and doffing" of sanitary and protective gear was compensable work time. 350 Wis. 2d 380, ¶1. There, the Tyson employees at the Jefferson plant primarily produced pepperonis, a ready-to-eat meat product. <u>Id.</u>, ¶4. To answer the question of whether the employees "donning and doffing" qualified as compensable worktime, the court conducted a two-step analysis.

¶155 First, it began with the statutory language of Wis. Admin. Code § DWD 272.12(1)(a)1., which contains two requirements: the activity (1) must be "controlled or required by the employer" and (2) must be done "necessarily and primarily for the benefit of the employer's business." <u>Id.</u>, ¶¶17-21. Second, the court went on to discuss whether the activity was an

_____

[10] Similar to the lead opinion, I will also refer to <u>Weissman v. Tyson Foods, Inc.</u>, as "<u>Tyson Foods</u>."

"integral part" of a "principal activity." Id., ¶¶22-26. It concluded that an "integral part" meant an activity that is (1) closely related to the principal activity and (2) indispensable to its performance. Id., ¶¶26, 28-31. Using this two-step approach, the court concluded that the "donning and doffing" was compensable under the circumstances. Id., ¶37; but see Mitchell v. JCG Industries, Inc., 745 F.3d 837 (2014) (holding that the minimal time employees spent "donning and doffing" sanitary gear during bona fide meal breaks and at the beginning and end of each day was not work time that had to be compensated).

¶156 A few months after the Wisconsin Court of Appeals decided Tyson Foods, the Supreme Court of the United States decided Integrity Staffing Solutions, Inc. v. Busk, __ U.S. __, 135 S. Ct. 513 (2014).[11] In Integrity Staffing, the Court addressed the issue of "whether the employees' time spent waiting to undergo and undergoing [a] security screening[] [was] compensable under the [Fair Labor Standards Act]." 135 S. Ct. at 515. The Court concluded that the "roughly 25 minutes" employees spent each day was not compensable work time. Id.

¶157 In reaching that conclusion, the Court reiterated that it "has consistently interpreted 'the term "principal activity or activities" [to] embrac[e] all activities which are an integral and indispensable part of the principal activities.'" Id. at 517 (emphasis added) (quoting IBP, Inc. v. Alvarez, 546

---

[11] Similar to the lead opinion, I will also refer to Integrity Staffing Solutions, Inc. v. Busk, as "Integrity Staffing."

10

U.S. 21, 29-30 (2005)). Moreover, the Court clarified that "an activity is . . . integral and indispensable to the principal activities that an employee is employed to perform if it is an <u>intrinsic element</u> of those activities and <u>one with which the employee cannot dispense</u> if he is to perform his principal activities." <u>Id.</u> (emphasis added). Finally, the court unequivocally rejected other courts' reliance on a required-benefit analysis: "The [Ninth Circuit] erred by focusing on whether the employer required a particular activity. The integral and indispensable test is tied to the productive work that the employee is employed to perform." <u>Id.</u> at 519 (emphasis omitted). Additionally, the Court noted, "A test that turns on whether the activity is for the benefit of the employer is similarly overbroad."[12] <u>Id.</u> The Court rejected the required-benefit approach because "[i]f the test could be satisfied merely by the fact that an employer required an activity, it would sweep into 'principal activities'" the type of preliminary and postliminary activities that Congress worried would "bring about the financial ruin of many employers," would result in "windfall payments" to employees, and attempted to remedy when

---

[12] I agree with the lead opinion's and the concurring/dissenting opinion's conclusion that <u>Tyson Foods</u> need not be overruled because although the court of appeals applied a required-benefit test, it went on to discuss whether the "donning and doffing" under the circumstances present in that case were "integral and indispensable" to a principal activity.

11

it enacted the Portal-to-Portal Act.[13] Id. at 517, 519 (internal quotation marks omitted) (quoting 29 U.S.C. §§ 251(a)-(b)).

¶158 The "integral and indispensable" test is no cake walk for the party who seeks to establish its requisite elements; it imposes a tough standard. For example, in Steiner v. Mitchell, 350 U.S. 247 (1956), the Court addressed

> whether workers in a battery plant must be paid as part of their "principal" activities for the time incident to changing clothes at the beginning of the shift and showering at the end, where they must make extensive use of dangerously caustic and toxic materials, and are compelled by circumstances, including vital consideration of health and hygiene, to change clothes and to shower in facilities in which the state law required their employer to provide, or whether these activities are "preliminary" or "postliminary" . . . .

350 U.S. at 248 (emphasis added). In answering that question, the Court looked to the particular circumstances of the battery

---

[13] Congress enacted the Portal-to-Portal Act in an effort to remedy a judicial interpretation of the Fair Labor Standard Act that if permitted to stand would have "br[ought] about the financial ruin of many employers" and would have resulted in a windfall of payments to employees "for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay." Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513, 517 (2014) (internal quotation marks omitted) (quoting 29 U.S.C. §§ 251(a)-(b)). The Portal-to-Portal Act exempted employers from liability for claims based on "activities which are preliminary to or postliminary to said principal activity or activities." Id. (quoting 29 U.S.C. § 254(a)). These preliminary or postliminary activities "occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." Id. (quoting 29 U.S.C. § 254(a)).

plant, which included the fact that employees "customarily work with or near the various chemicals in the plant[, including] lead metal, lead oxide, lead sulphate, lead peroxide, and sulphuric acid." Id. at 249. There, the "very great" risks associated with the plant's conditions mandated "the removal of clothing and showering at the end of the work period." Id. at 250. In fact, the practice of clothing removal and showering "[had] become [such] a recognized part of industrial hygiene programs in the industry [that] the state law of Tennessee [required] facilities for th[at] purpose." Id.

¶159 Under those circumstances, the trial court found, and the Court agreed, that the employees' activities (changing clothes and showering) "[were] made necessary by the nature of the work performed; . . . and that they [were] so closely related to other duties performed by (petitioners') employees as to be an integral part thereof, and [were], therefore, included among the principal activities of said employees." Id. at 252 (emphasis added) (internal quotation marks omitted). In short, changing clothes and showering was an "integral and indispensable" part of the production of batteries because without it, employees would be exposed to chemicals and potentially poisoned. Id. at 249. To emphasize just how integral the changing and showering was under those particular circumstances, the Court concluded by saying, "[I]t would be difficult to conjure up an instance where changing clothes and showering are more clearly an integral and indispensable part of

13

the principal activity of the employment than in the case of these employees." Id. at 256.

¶160 Mitchell v. King Packing Co., 350 U.S. 260 (1956), serves as another example of just how tough the "integral and indispensable" test is. In Mitchell, the Court considered "whether the knife-sharpening activities of the employees of respondent King Packing Co." were an "integral and indispensable" part of the principal activity of meatpacking. 350 U.S. at 261. Meatpacking includes the "slaughtering, butchering, dressing, and distributing" of meat. Id.

¶161 There, the Court noted that "[v]arious knives and electric saws [were] used on the butchering operation" and that "all of the knives as well as the saws must be 'razor sharp' for the proper performance of the work." Id. at 262 (emphasis added). The knives needed to be "razor sharp" because "a dull knife would slow down production which is conducted on an assembly line basis, affect the appearance of the meat as well as the quality of the hides, cause waste and make for accidents." Id. The Court added, "[for] a knife to be of any practical value in a knife job[, it] has to be . . . sharp." Id. (emphasis added). Consequently, the Court held that the knife-sharpening activities were "an integral part of and indispensable to the various butchering activities for which [the employees] were principally employed." It did so because the knives needed to be "razor sharp" to perform the principal activity of slaughtering, butchering, dressing, and distributing the meat. Id. at 261, 262.

14

C. THE OUTCOME OF THE LEAD OPINION AND THE CONCURRING/DISSENTING OPINION CANNOT SURVIVE APPLICATION OF THE "INTEGRAL AND INDISPENSABLE" TEST.

¶162 Turning to the employees at the Beloit cannery, I conclude that the "donning and doffing" of the "whites" is not "integral and indispensable" to performance of a principal activity; therefore, it is not compensable. In this case, the "donning and doffing" of the "whites" by Hormel's employees is not an "intrinsic element" of canning food; moreover, an employee could easily dispense with the "donning and doffing" of the "whites" and still complete his or her principal activity of safely canning clean food.

¶163 As a result, the lead opinion's and the concurring/dissenting opinion's conclusion that the "donning and doffing" of the "whites" is "integral and indispensable" to a principal activity is incorrect. It is incorrect for two main reasons: (1) the lead opinion says that the applicable federal food, health, and safety regulations require Hormel to have its employees "don and doff" the "whites", but the regulations do not contain such a requirement; and (2) the lead opinion relies on and affirms the circuit court's analysis, but the circuit

court applied the wrong test.[14] I will discuss these two reasons in detail, and then I will provide two examples of when "donning and doffing" would be compensable.

### 1. The FDA and USDA Regulations Do Not Support The Lead Opinion's Conclusion.

¶164 To begin, the "donning and doffing" of the "whites" is not required by the applicable federal food, health, and safety regulations. There was abundant testimony regarding this point at trial:

Q. <u>Are the whites necessary to avoid contamination at the Beloit facility?</u>

A. <u>No, they're not.</u>

Q. Can you explain to me why that is?

A. Again, back to the regulation, there's various means to an end. And in that type of environment, in the food safety realm, we kind of categorize our plants into, you know, maybe high-risk operations. In our meat and poultry establishments that produce ready, or what we determine to be ready-to-eat exposed meat products, those are determined to be high-risk operations. Canning operations such as the Beloit

---

[14] Although this dissent refers most often to the lead opinion, the concurring/dissenting opinion suffers from the same shortfalls because it agrees with the lead opinion's point of view: "While I do not join the lead opinion, I agree with its conclusion that donning and doffing of company-required clothing and gear at the beginning and end of the workday is 'an integral part of a principal activity' of Hormel Foods Corporation for which compensation is required," concurrence/dissent, ¶108 (footnote omitted) (citing Lead op., ¶7), and "I agree with the lead opinion's conclusion that § DWD 272.12(2)(e)1. requires Hormel to compensate its employees for 5.7 minutes per day that have been cabined for donning and doffing clothing and equipment at the beginning and end of the workday," <u>id.</u>, ¶117 (citing Lead op., ¶7).

16

facility are deemed lower risk due to that 12-D type cook process, the canning process in general.

Q. <u>Could Hormel allow employees to wear street clothes at the Beloit facility and still comply with the FDA regulations?</u>

A. <u>Yes, they could.</u>

Q. And could Hormel allow employees to bring whites home with them and bring them back to the facility and still comply with the FDA regulations?

A. Yes, they could. <u>The clothes just need to be clean.</u>

Q. <u>So long as the clothing is clean?</u>

A. <u>That's correct.</u>

Q. Do the FDA regulations require employees at the Beloit facility to keep their shoes within the facility?

A. No, they do not.

Q. What, if anything, do the regulations require in terms of the shoes people wear at the Beloit facility?

A. Again, it's just clean and what we need to prevent adulteration of the product.

Q. Are captive, or as you've termed it, dedicated shoe, is that necessary to avoid contamination at the Beloit facility?

A. No, it's not.

. . .

Q. Do the FDA regulations require employees at the Beloit facility to wear the hardhats that you see on Holly Hormel?

A. No, the FDA regulations do not.

Q. What, if anything, do the FDA regulations require in terms of hardhats?

A. In terms of hardhats, nothing. As far as hair covering, they leave it to our discretion. The hair

17

should be secured, a manner secured to prevent the potential for product adulteration.

. . .

Q. Okay. Do the FDA regulations require employees at the Beloit facility to wear safety glasses?

A. No.

Q. Do the FDA regulations require employees at the Beloit facility to wash their hands?

A. Again, the regulations are not very specific. It's somewhat of a means to an end, and it does describe where necessary they should be washing their hands. So if they're in direct product contact, they should be washing their hands per the FDA regulations.

(Emphasis added.) Similarly, the USDA regulations do not require

"donning and doffing":

Q. Do the USDA regulations require employees at the Beloit facility to wear whites?

A. No, they do not.

Q. What, if anything, do the USDA regulations require in terms of clothing at the Beloit facility?

A. Again, it's very open-ended in terms of, you know, there's various means to an end. We just have to prevent adulteration and the creation of insanitary conditions. So essentially clean clothes.

Q. Do the USDA regulations specify who has to own or launder the clothing worn at the Beloit facility?

A. They do not.

Q. Do the regulations specify where those items are donned and doffed and stored?

A. No.

Q. Does wearing the whites at the Beloit facility comply with the USDA regulations?

A. Yes, it does.

18

> Q. <u>Are whites necessary to prevent the adulteration of product or the creation of insanitary conditions at the Beloit facility?</u>
>
> A. <u>No, they're not.</u>

(Emphasis added.) After hearing all the testimony regarding the federal regulations, the circuit court even concluded that the federal regulations do not require employees to wear the "whites," do not specify where the "whites" have to be "donned," "doffed," or stored, and do not require captive shoes. Indeed, the circuit court concluded that "<u>Hormel employees could wear street clothes at the Beloit facility and still comply with the USDA and FDA regulations</u>." (Emphasis added.) In sum, compliance with the federal regulations under these circumstances is not——and cannot be——what makes the "donning and doffing" of the "whites" "integral and indispensable" to the employees' principal activity of canning food. The lead opinion nonetheless contorts these federal regulations into just such a conclusion.

### 2. The Lead Opinion Conflates The Required-Benefit Test With The "Integral and Indispensable" Test.

¶165 The lead opinion's reliance on the circuit court's "comprehensive decision holding in favor of the Union" is mistaken because the circuit court incorrectly applied the "integral and indispensable" test by repeatedly focusing on whether the "donning and doffing" was required by and benefitted Hormel. Lead op., ¶5. In other words, the lead opinion conflates the required-benefit test with the "integral and indispensable" test.

¶166 After discussing whether the "donning and doffing" of the "whites" was required by and benefitted the employer, the

19

circuit court appeared to transition to analyzing and applying the "integral and indispensable" test. In fact, the heading of this section in the circuit court's opinion and order reads, "ARE THE ACTIVITIES CLOSELY RELATED TO AND INDISPENSABLE TO PERFORMANCE OF A PRINCIPAL ACTIVITY?" Moreover, the circuit court acknowledged that "[e]ach of the class members agreed that there was nothing essential about the clothes Hormel required them to wear in order to get their job done. Each of them agreed that they could probably perform each of the movements required by their job even if wearing street clothes." The circuit court went on to quote plant manager Scott Ramlo:

> A. _The clothes that they put on are there for their benefit and they're a good manufacturing practice and we require it, that's not disputed. But it, it doesn't have anything to do with the production of the product, I guess, for lack of -- maybe I'm oversimplifying it, but its not required, it -- I'm sorry, it's not essential as they make the product, it adds nothing to it._ Now there are certain food manufacturing processes that, you know, perfectly clean clothes and, and like a ready-to-eat atmosphere, say something like that, we don't have any of those in the Beloit plant that it might add some value to it. _But I can go there today and produce the products and do everything that everybody had on that screen other than the sanitation job, I can make that product the same quality._ It's no different. And the key to the whole process in the Beloit plant being a cannery is that the product is pressure cooked and it's shelf-stable. So any microorganisms, that type of thing that might be inferred by having perfectly clean clothing each day really is negated by the thermal process. . . .

(Emphasis added.) Rather than applying the "integral and indispensable" test, however, the circuit court's analysis transformed into an analysis of the required-benefit test:

20

"[t]he most important part of [Scott Ramlo's] answer was at the start when he admitted that wearing the whites and gear was <u>required by Hormel</u>." (Emphasis added.)

¶167 The circuit court's emphasis ("the most important part") on the fact that "donning and doffing" the "whites" was required by the employer shows that the circuit court mixed a required-benefit analysis into what was supposed to be an "integral and indispensable" analysis. In fact, the circuit court's analysis is littered with references to the fact that "donning and doffing" was required by and benefitted Hormel:

> <u>Ms. Collins agreed that she could physically perform the tasks she is required to perform at work in clothes she wore from home but</u> Ms. Collins continually, and correctly, pointed out that <u>she is required to wear</u> those clothes and equipment in order to get into the canning part of the plant <u>pursuant to Hormel's rules</u>.
>
> <u>The overwhelming evidence is that Hormel requires the class member to don and doff</u> those materials to operate the Beloit facility in compliance with the federal regulations of USDA, FDA, and OSHA. There are also efficiencies already noted, an avoidance of recalls, and customer satisfaction benefits. <u>All of these benefits are in place for Hormel because it requires the Class members to don and doff</u> the clothing and equipment on the premises.
>
> I further find that the donning and doffing of the whites and related gear is indispensable to the performance of the class members' principal activities. <u>This is so because Hormel has made it so.</u> The only credible evidence is that <u>Class members are required</u> to wear these materials . . . ."
>
> These acts are obligatory, essential, and absolutely necessary because <u>Hormel controls</u> the process <u>and has required</u> these acts.

> The focus is not on what the United States government may require but, instead, what <u>Hormel requires</u> of its own employees.
>
> These activities are <u>controlled by the employer for the employer's benefit</u> and are integral to the Class members' work.

(Emphasis added.) These are just a handful of times the circuit court looked at what Hormel required and whether Hormel benefited rather than looking to whether the "donning and doffing" of the "whites" was "integral and indispensable" to the <u>principal activity of canning food</u>.[15] The circuit court did not have the benefit of the Supreme Court of the United State's decision in <u>Integrity Staffing</u> as the circuit court's decision was issued prior to <u>Integrity Staffing</u>. However, this court <u>did</u> have such guidance. The lead opinion's choice to rely on the circuit court's "comprehensive decision holding in favor of the Union" rather than the Supreme Court's instruction in <u>Integrity Staffing</u> is curious.

D. ADDITIONALLY, THE TIME SPENT "DONNING AND DOFFING" THE "WHITES" DURING MEAL PERIODS IS NOT COMPENSABLE WORK TIME.

¶168 Related to the question of whether "donning and doffing" of the "whites" at the beginning and end of each work day is compensable, is the question of whether "donning and doffing" during the employees' 30-minute meal period is compensable. I have already concluded that the "donning and doffing" of the "whites" is not compensable because it fails the

---

[15] Indeed, the circuit court seems to have concluded that the "donning and doffing" of the "whites" is indispensable because it is required. This is a conflation of the required-benefit analysis and the "integral and indispensable" analysis.

22

"integral and indispensable" test. However, I briefly comment on the lead opinion's and the concurring/dissenting opinion's analyses of this issue because I believe that neither can square their determinations that the "donning and doffing" of the "whites" at the beginning and end of the workday is compensable with their determinations that the exact same "donning and doffing" is not compensable when done over the lunch hour.

¶169 Most Hormel employees have a 30-minute unpaid lunch break. An employee may choose to go off his or her work premises to eat a meal. If an employee leaves, he or she is required to change out of his or her "whites" and then change back into the "whites" when he or she returns. Regardless of whether the employee leaves (and accordingly "dons and doffs") or stays on site, the employee is entitled only to 30 minutes.

¶170 Hormel's employees argue that they have been denied the "right under Wisconsin law to have a 30-minute lunch period free from duty in which the employee is free to leave the premises." The test for whether meal time "donning and doffing" is compensable is simple and familiar: meal time "donning and doffing" is compensable if it is "integral and indispensable" to an employee's principal activity.[16]

---

[16] In an attempt to reach its current outcome, the concurring/dissenting opinion distorts the analysis for lunchtime "donning and doffing." Although the concurring/dissenting opinion believes the "donning and doffing" of the whites is "integral and indispensable" to "sanitary food production" at the beginning and end of the day, it concludes that the same "donning and doffing" of the same "whites" is no longer "integral and indispensable" to "sanitary food production" when done over the lunch hour. Concurrence/Dissent, ¶121. The concurring/dissenting opinion states,

(continued)

23

¶171 The lead opinion and the concurring/dissenting opinion believe that the "donning and doffing" of the "whites" is "integral and indispensable" to canning food and, therefore, compensable. Except, that is, when the "donning and doffing" occurs during the lunch hour instead of at the beginning and end of the work day. But the employees' principal activity has not changed; it is still canning food. And what is required to be "donned and doffed" has not changed; it is still the "whites."

---

> First, <u>no interest of Hormel</u> is served by employees leaving its facility during lunch break. Stated otherwise, leaving Hormel's facility at lunch does not aid in sanitary food production, which is a principal activity of Hormel. Second, the <u>choice</u> to leave Hormel's facility at lunch is totally each individual employee's <u>choice</u>, not Hormel's.

<u>Id.</u>, ¶122 (emphasis added). There are two problems with this conclusion.

First, the concurring/dissenting opinion focuses on what Hormel requires and whether Hormel benefits. As laid out in full earlier, conflating the required-benefit test with the "integral and indispensable" test goes against the law as clarified by the Supreme Court of the United States in <u>Integrity Staffing</u>.

Second, the concurring/dissenting opinion applies the wrong test by focusing on the employees' choice to leave. The test is whether the "donning and doffing" of the "whites" when entering and exiting the Beloit cannery (whether at the beginning and end of the day or at lunch) is "integral and indispensable" to canning food. The lead opinion and concurring/dissenting opinion say it is at the beginning and end of the day. Common sense would dictate that if "donning and doffing" the "whites" is "integral and indispensable" to canning food at the beginning and end of the day, then it must also be "integral and indispensable" to canning food at the middle of the day after lunch.

24

The only change is the time at which the employee "dons and doffs."

¶172 To say that "donning and doffing" of the "whites" is "integral and indispensable" when an employee arrives and leaves at the end of the day but is not "integral and indispensable" when an employee leaves and arrives at lunch is unsupported by the law. If the lead opinion and the concurring/dissenting opinion conclude (as they do) that the "donning and doffing" of the "whites" is so "integral and indispensable" to canning food at the start of the shift at the beginning of the day that it must be compensable, then they must also conclude that the "donning and doffing" of the "whites" is "integral and indispensable" to canning food at the start of the shift after the lunch period. The lead opinion and the concurring/dissenting opinion somehow do not. In doing so, the lead opinion and the concurring/dissenting opinion admit that the "donning and doffing" of the "whites" is not truly "integral and indispensable" to the employees' principal activity of canning food.

E. "DONNING AND DOFFING" IS SOMETIMES COMPENSABLE.

¶173 That the "donning and doffing" of the "whites" is not compensable under our specific factual circumstances becomes abundantly clear when compared to "donning and doffing" that is compensable under other circumstances.

¶174 For instance, some of Hormel's employees are part of a sanitation crew; these sanitation crew members "play a real critical part in cleaning the entire plant up top to bottom

25

every night . . . ." Employees who work in sanitation wear different and additional clothing and equipment:

> They will wear--the eyewear is more of a goggles and, in addition to a face shield. They also wear--the footwear would be different. They're standing in water the entire time. So tennis shoes, something like that, wouldn't be appropriate. And then they have--we call it a rain suit, but it's just a big yellow pants with suspenders and a coat that's yellow, too. So it protects them. And then they also, I think all of them wear arm guards. So you're sealed against the chemicals that you work with. Pretty much every job in our wet area, you're dealing with chemicals every night.

Hormel pays its sanitation workers to "don and doff" this additional clothing and equipment because "[the sanitation workers] really couldn't do their job without [it]. I mean safety and commonsense, everything says that they wouldn't be able to safely work out there with all those chemicals without this equipment." (Emphasis added.) Simply put, the sanitation crew's principal activity is sanitizing the plant, and sanitizing the plant necessitates contact with "very caustic or acidic" chemicals; therefore, the sanitation crew must wear protective gear in order to sanitize the plant with chemicals.[17]

---

[17] Scott A. Ramlo, plant manager at the Beloit cannery, testified that some of the chemicals the sanitation crew works with are "very caustic or acidic and will cause skin damage, irritation." He went on to say the following:

> Q. I'm sorry? Now, what, what are the cleaning materials please?

> A. It can be any number of chemicals, but it's a foam that comes from a central foaming station that will break the surface tension of the product on to the stainless steel. . . . So the foam that he's using and applying there is corrosive materials that you

(continued)

26

¶175 Here is a second example. In addition to running a cannery, Hormel runs other types of food-related operations. In Algona, Iowa, Hormel runs a dry sausage operation, which primarily makes pepperonis.[18] At trial, Francisco Velaquez, a resource and safety manager at Hormel, testified that pepperoni is a ready-to-eat meat product that must be produced in a ready-to-eat facility. For comparison, plants that produce ready-to-eat meat products are considered "high-risk operations" whereas canneries are considered "lower risk" because food product at a cannery goes through the 12-D cook or acidification processes. Because pepperonis are a high-risk, ready-to-eat meat product, employees at this type of facility must "don and doff" additional items on top of their "whites" to prevent different types of contamination (contamination that is not annihilated with a 12-D cook or acidification process).[19]

---

have to be protected from. And he'll spray that. After he's done, a quick rinse of the equipment when he first got to it, then he'll come and put that foam over the entire, all that equipment. You can see it's foam because it clings.

(Emphasis added.)

[18] Interestingly, the employees in Tyson Foods primarily made pepperonis.

[19] Scott Ramlo, plant manager at the Beloit facility, testified, "There are certain things that you should probably do if you're making bacon or pepperoni or something that somebody's going to eat right out of the package versus what we do, which is a thermos-processed product that's fully processed in a can, very different than some other products."

¶176 For instance, a high-risk, ready-to-eat meat facility is especially concerned with Listeria or Salmonella, which is often tracked into a plant by street shoes. To combat those risks, "[Hormel] ha[s] [its employees] change into these rubber boots. Then [the employees] have to go through something called a boot scrubber, and there [Hormel] appl[ies] quaternary ammonium" to reduce contamination. Additionally, employees "typically have plastic aprons that they put over their whites. . . . And then they have these things called sleeve guards that are plastic that go up to their elbows, and then they have rubber gloves that they wear that they tuck under their sleeve guards."

¶177 Employees at these high-risk, ready-to-eat meat facilities are paid for the time they spend "donning and doffing" their additional gear; that is, they are paid for the time it takes to put on, wash, and take off their boots as well as the time it takes to put on and take off their aprons, sleeve guards, and rubber gloves. The "donning and doffing" of this extra gear is compensable because it is "integral and indispensable" to producing high-risk, ready-to-eat meat products.

¶178 The above two examples help to illustrate exactly what the "integral and indispensable" test calls for. Namely, for the employer-required activity to be compensable, it must be an "intrinsic element" of the activity performed and "one with which the employee cannot dispense if he is to perform those activities." Integrity Staffing, 135 S. Ct. at 517. A sanitation

28

crew member cannot dispense with his or her extra clothing and equipment due to the "very caustic or acidic" chemicals he or she is exposed to while performing his or her principal activities of cleaning and sanitizing. A ready-to-eat meat facility employee cannot dispense with his or her extra clothing and equipment due to the high-risk nature of certain types of contamination at a ready-to-eat meat facility. But a cannery employee at a "lower risk" facility can dispense with wearing "whites" and still safely produce clean food.

¶179 In sum, Hormel's own employees put it best when they testified, and the circuit court found that "there is nothing essential about the clothes Hormel required them to wear in order to get their job done." (Emphasis added.) I agree with Hormel's employees. The "donning and doffing" of the "whites" is not "integral and indispensable" to the Beloit employees' principal activity of canning food; therefore, the time spent "donning and doffing" the "whites" is not compensable.

### III. WHAT THE LEAD OPINION DOES NOT DECIDE: THE DE MINIMIS NON CURAT LEX DOCTRINE.

¶180 I now turn to the second issue: whether the requirement for compensation for time spent "donning and doffing" would be obviated by the doctrine of de minimis non curat lex ("the law doesn't care about trifles"). Because I have concluded that the employees "donning and doffing" of the "whites" is not compensable, I need not consider whether the time spent "donning and doffing" is de minimis.

¶181 However, I write to point out that the lead opinion, while pretending to engage in a de minimis-like discussion, does

not actually answer the question before us. Specifically, the lead opinion does not determine whether the de minimis doctrine applies in Wisconsin, does not explain what test or approach it used to reach its conclusion, and thus, does not provide any guidance for courts and parties moving forward. We grant review of cases only when "special and important reasons are presented" and when a decision will help "develop, clarify or harmonize the law." Wis. Stat. § 809.62(1r),(1r)(c). In choosing not to answer the question before this court, the lead opinion fails to help "develop, clarify or harmonize the law." As a result, while this case is decided by the lead opinion for these employees at this facility, the issue of whether the de minimis doctrine applies in Wisconsin and how a de minimis determination would be conducted lives on.[20]

¶182 The de minimis doctrine simply asks the following: should all "integral and indispensable" activities, including those that last a single second or a handful of seconds or minutes be recorded by and paid for by an employer? See Anderson

_____

[20] As stated previously, we were called upon to determine whether the de minimis doctrine applies in Wisconsin. This was a question of first impression for this court. The concurring/dissenting opinion appears to adopt the de minimis doctrine in Wisconsin. It states, "I adopt and apply the Lindow test . . . .," concurrence/dissent, ¶130, and "If the time allocated for donning and doffing were not cabined at a specified number of minutes per employee per workday, the de minimis rule would preclude compensation . . . .," id., ¶109. But the concurring/dissenting opinion fails to explain why it chooses to adopt the de minimis doctrine in Wisconsin. Similar to choosing not to answer the question at all, blind adoption of the doctrine without any explanation fails to help "develop, clarify or harmonize the law." Wis. Stat. § 809.62(1r),(1r)(c).

v. Mt. Clements Pottery Co., 328 U.S. 680, 692 (1946) ("Split-second absurdities are not justified by the actualities of working conditions . . . ."). Or are there ever activities that take such a small, trivial amount of time that a court should not expect an employer to keep track of and compensate for this time? See JCG Industries, 745 F.3d at 842, 841 (noting that "[c]ommon sense has a place in adjudication" and commenting that "[o]ne reason to withhold a remedy is that the harm is small but measuring it for purposes of calculating a remedy would be difficult, time-consuming, and uncertain, hence not worthwhile given that smallness"); Lindow v. United States, 738 F.2d 1057, 1062 (9th Cir. 1984) ("[C]ommon sense must be applied to the facts of each case."). The Supreme Court of the United States answered the de minimis question by holding that "[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded." Anderson, 328 U.S. at 692.

¶183 As a result, when a federal court determines that the time spent on an activity is compensable because it is "integral and indispensable," the court next determines whether that compensable time is rendered non-compensable by the de minimis doctrine. See id. at 693; Lindow, 738 F.2d at 1062 ("As a general rule, employees cannot recover for otherwise compensable time if it is de minimis."). In contrast, when a federal court determines that the time spent on the activity is not "integral and indispensable," the court's analysis ends and no compensation is due. See Integrity Staffing, 135 S. Ct. at 515

31

(concluding that the activity was not "integral and indispensable" and, therefore, not proceeding to a de minimis analysis). We have never before determined whether we should take this same approach in Wisconsin.[21] We were called upon to make that determination in this case.

¶184 Because the lead opinion concludes that the employees "donning and doffing" of the "whites" is compensable, it could have engaged in a full discussion of whether the de minimis doctrine applies in Wisconsin.[22] But it did not. To quote the lead opinion,

---

[21] If we adopt this approach, then one possible way of resolving this issue would be as follows: (1) if a court concludes that an activity is not "integral and indispensable," then the analysis ends and no compensation is owed; but (2) if a court concludes that an activity is "integral and indispensable," then it must next consider whether the time spent on that activity is so short in duration that it qualifies as de minimis, in which case the time is not compensable. Under this approach, because the lead opinion and the concurring/dissenting opinion concluded that the time spent "donning and doffing" is "integral and indispensable," they would need to then consider whether that time is so short in duration that it qualifies as de minimis. If it qualifies as de minimis, then no compensation is due.

[22] Simply put, the lead opinion had an abundance of options in this case, but it chose none. The lead opinion could have concluded that the de minimis doctrine does not apply in Wisconsin. The lead opinion could have concluded that the de minimis doctrine applies in Wisconsin and then provided a practical framework for how to conduct a de minimis analysis. The lead opinion could have concluded that the de minimis doctrine applies and then held that the 2.903 minutes spent donning and doffing each day was too long in duration to qualify as de minimis. Rather than choose any of the above options, the lead opinion picked an outcome and reached a conclusion for these litigants on this day.

32

> Assuming, without deciding, that the de minimis doctrine is applicable to claims under Wis. Admin. Code § 272.12, we conclude that in the instant case, the de minimis doctrine does not bar compensation for the time spent donning and doffing the required clothing and equipment because the time spent donning and doffing is not a "trifle."

Lead op., ¶98 (emphasis added).[23] Why assume without deciding? The question was certified by the court of appeals, the parties spent roughly 17 pages of their respective briefs on the issue, and the parties addressed this issue during oral argument before this court. Perhaps the lead opinion chooses not to answer the question because it cannot reach its present outcome given what the law is.

¶185 The law is this. The Supreme Court of the United States first applied the de minimis doctrine in Anderson v. Mt. Clements Pottery Co., 328 U.S. 680 (1946). There, the employees alleged that their employers' method of calculating hours did not "accurately reflect all the time actually worked and that they were thereby deprived of" proper overtime compensation. Anderson, 328 U.S. at 684. The employees wanted their walk time to and from their workstations as well as their "donning and doffing" of work clothing included in their work hours. Id. at 682-83.

¶186 In resolving that question, the Court noted,

---

[23] The concurring/dissenting opinion also notes that the lead opinion dodges the question of whether the de minimis doctrine applies in Wisconsin: "The lead opinion concludes that donning and doffing at the beginning and end of the workday are not de minimis, assuming that the de minimis rule may be applied to the Union's claims." Concurrence/Dissent, ¶1125 (emphasis added).

33

> When the matter in issue concerns only a <u>few seconds</u> <u>or minutes</u> of work beyond the scheduled working hours, such trifles may be disregarded. Split-<u>second</u> absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. <u>It is only when the employee is</u> <u>required to give up a substantial measure of his time</u> and effort that compensable working time is involved.

<u>Id.</u> at 692 (emphasis added). Later in the opinion, the Court reiterated, "it is appropriate to apply a <u>de minimis</u> doctrine so that <u>insubstantial and insignificant periods of time</u> spent in preliminary activities need not be included in the statutory workweek. <u>Id.</u> at 693 (emphasis added). The <u>Anderson</u> Court's focus was on time, specifically whether the activity took just "a few seconds or minutes." <u>See also</u> <u>Lindow</u>, 738 F.2d at 1062 ("An important factor in determining whether a claim is <u>de</u> <u>minimis</u> is the amount of daily time spent on the additional work.").

¶187 While making sure to explain that it is not deciding whether the <u>de minimis</u> doctrine applies in Wisconsin, the lead opinion nevertheless discusses the doctrine and pays lip service to <u>Anderson</u> by quoting its use of the word "trifle." But unsurprisingly the lead opinion chooses not to apply <u>Anderson</u>'s test.[24] Instead, the lead opinion cherry-picks one factor (not

---

[24] Again unsurprisingly, the concurring/dissenting opinion also gives <u>Anderson</u>, the Supreme Court of the United States decision that created the <u>de minimis</u> doctrine, a fleeting glance. The concurring/dissenting opinion mentions <u>Anderson</u> a meager three times in its entire <u>de minimis</u> discussion, which spans approximately five pages. <u>See</u> Concurrence/Dissent, ¶¶126, 128, 131. Rather than rely on a Supreme Court decision, the concurring/dissenting opinion roots its analysis in a Ninth Circuit opinion, <u>Lindow v. United States</u>, 738 F.2d 1057 (9th Cir. 1984). In fact, the concurring/dissenting opinion formally
(continued)

34

found in <u>Anderson</u>) in which to ground its conclusion.[25] The lead opinion states,

> [i]n the instant case, employees spend approximately 24 hours <u>per year</u> donning and doffing. Viewed in light of the employees' hourly rate of <u>$22 per hour</u>, the unpaid period in question may amount to over <u>$500 per year</u> for each employee and <u>substantial sums</u> for Hormel. We agree with the circuit court that in the instant case this time is not a "trifle."

Lead op., ¶102 (emphasis added).[26]

---

"adopt[s] and appl[ies] the <u>Lindow</u> test." Concurrence/Dissent, ¶130.

<u>Lindow</u> is cited by federal courts for its four-factor <u>de minimis</u> approach. Under <u>Lindow</u>, a <u>de minimis</u> determination looks at (1) the amount of daily time spent on the additional work, (2) the administrative difficulty in recording that additional time, (3) the aggregate amount of compensable time, and (4) the regularity of the additional work. 738 F.2d at 1062-63. Missing from the concurring/dissenting opinion's discussion of <u>Lindow</u> is a critical quote from <u>Lindow</u>: "Most courts have found daily periods of approximately 10 minutes <u>de minimis</u> even though otherwise compensable." <u>Id.</u> at 1062. <u>Lindow</u> itself stands for the proposition that the 7 to 8 minutes employees spent on activities qualified as <u>de minimis</u>. <u>Id.</u> at 1063-64.

[25] The lead opinion does not cite <u>Lindow</u>, but it arguably is where the lead opinion hand-picked the aggregate sum factor. If so, the lead opinion conveniently forgot to look at the first factor: "the amount of <u>daily time</u> spent on the additional work." <u>Lindow</u>, 738 F.2d at 1062 (emphasis added).

[26] The concurring/dissenting opinion also utilizes an aggregate sum factor: "In addition, although 5.7 minutes per day is a small amount of time, because it is expended every day, the <u>aggregate amount</u> of each employee's claim per year is $500, which is significant. It is also significant to Hormel as an <u>aggregate amount</u> for all food preparation employees." Concurrence/Dissent, ¶136 (emphasis added). Not only is the lead opinion's and the concurring/dissenting opinion's seemingly outcome oriented choice to ground their analyses in an aggregate sum factor not supported by the law (namely, <u>Anderson</u>), but also their outcome leads to disparate treatment under the law. A <u>de minimis</u> analysis that is focused on a dollar figure will favor

(continued)

35

¶188 Hidden in the lead opinion's language is a conclusion that is at odds with the law: that 2.903 minutes is not <u>de minimis</u>. The lead opinion cannot state outright that 2.903 minutes is not <u>de minimis</u> because it would be hard-pressed to reconcile that determination with the fact that <u>Anderson</u> designed the <u>de minimis</u> doctrine to preclude compensation when "the matter in issue concerne[d] only a <u>few seconds or minutes of work</u>." 328 U.S. at 692 (emphasis added). Moreover, it cannot state outright that 2.903 minutes is not <u>de minimis</u> because it would have to face the fact that "[m]ost courts have found <u>daily periods of approximately 10 minutes de minimis</u> even though otherwise compensable." <u>Lindow</u>, 738 F.2d at 1062 (emphasis added) (holding that the 7 to 8 minutes the employees spent on a pre-shift activity in that case was <u>de minimis</u> and citing a litany of cases for the proposition that daily periods of 10 minutes or less are <u>de minimis</u>).

_____

those employees who are paid a higher wage. Employees who make only $5 per hour and file a wage and hour claim will have their aggregate sum declared <u>de minimis</u>, but employees who make $22 per hour will have their aggregate sum declared not <u>de minimis</u>. Perhaps this is why <u>Anderson</u>'s focus was on time, and whether the activity concerned just a few "minutes or seconds."

36

¶189 If the lead opinion were to actually answer the question of whether the de minimis doctrine is a part of Wisconsin law, then it would have to focus on——or at the very least discuss——the amount of daily time spent on "donning and doffing" (here, 2.903 minutes) and whether that time qualifies as just a few "seconds or minutes." The lead opinion tiptoes past this quagmire by sidestepping the question entirely.[27]

---

[27] The concurring/dissenting opinion also creeps past the time predicament but does so in a different way. The concurring/dissenting opinion concludes,

> If the time allocated for donning and doffing were not cabined at a specified number of minutes per employee per workday, the de minimis rule would preclude compensation because keeping accurate payroll records of the varying time that each employee spends donning and doffing would appear to be a nearly impossible administrative task for Hormel.

Concurrence/Dissent, ¶109. In sum, because the parties stipulated to 5.7 minutes, 5.7 minutes is not de minimis. Otherwise, 5.7 minutes would be de minimis. According to the concurring/dissenting opinion, this time becomes de minimis if it is not cabined because "if Hormel were required to record for payroll purposes the varying amounts of the time that each individual employee expends to don and doff at the beginning and end of each workday, it would appear to be almost an administrative impossibility to do so accurately." Id., ¶132; see also id., ¶¶ 109, 135, 138, 140.

The problem with the concurring/dissenting opinion's conclusion that it "would appear to be" an administrative impossibility to accurately record the time is that the circuit court made the exact opposite finding of fact in its opinion and order. The circuit court spent nearly two and a half pages in its order and opinion specifically addressing whether it would be administratively difficult for Hormel to accurately record "donning and doffing" time. Indeed, the section of the circuit

(continued)

37

Consequently, the question is left unanswered and Wisconsinites are left wondering.

¶190 In sum, the lead opinion could have resolved the issue of whether the de minimis doctrine applies in Wisconsin, and it could have provided a workable test or approach for how to conduct a de minimis analysis. It chose not to. When we accept a case, we do so to help "develop, clarify, or harmonize the law." As such, the lead opinion owed the people of Wisconsin and the parties a full and thorough discussion on whether the de minimis doctrine applies in Wisconsin as well as a discussion on the proper method or approach for conducting a de minimis analysis.

---

court's opinion and order is titled "Practical Administrative Difficulties." There, the court stated,

> Despite carrying the burden of proof on the de minimis issue, I find that Hormel has not provided credible evidence of administrative difficulties which may be encountered if it is required to record the additional donning and doffing time. As a result, factor two [of the Lindow test] also falls in favor of the Class.

(Emphasis added.) Later, the circuit court again emphasized that "the vague and unsubstantiated opinions of Hormel employees about the administrative difficulties of reimbursing the Class members for donning and doffing are belied by the daily activities at the Beloit Hormel plant. . . . Hormel's processes show that it is able to monitor [employees] adequately." (Emphasis added.) Thus, the concurring/dissenting opinion's conclusion that it "would appear to be" an administrative impossibility to record the time spent "donning and doffing" is directly contrary to the circuit court's explicit finding of fact on that point. The concurring/dissenting opinion "appears" to ignore the circuit court's opposite finding of fact, as it fails to acknowledge the circuit court's factual finding and fails to provide any discussion of whether the circuit court's finding would be clearly erroneous.

38

Because the lead opinion elects to leave today's question unanswered, it short-changes the people of Wisconsin.

## IV. CONCLUSION

¶191 I cannot join the lead opinion because I believe it reaches the wrong conclusion as to whether the "donning and doffing" of the "whites" is "integral and indispensable" and reaches no determination as to whether the de minimis doctrine is a part of Wisconsin law or how a de minimis analysis is to be conducted in future cases.

¶192 For the reasons stated, I respectfully dissent.

¶193 I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.

Table 1. Time (in minutes) to don and doff items and wash hands

| Activity | N | Median (in minutes) | Mean (in minutes) | Stdev (in minutes) |
|---|---|---|---|---|
| Doff Belt | 30 | 0.062 | 0.077 | 0.049 |
| Doff Ear Plugs | 45 | 0.033 | 0.040 | 0.020 |
| Doff Hair Net | 53 | 0.081 | 0.084 | 0.027 |
| Doff Hard Hat | 48 | 0.074 | 0.078 | 0.025 |
| Doff Safety Boots | 49 | 0.244 | 0.215 | 0.126 |
| Doff Safety Glasses | 41 | 0.058 | 0.058 | 0.023 |
| Doff Uniform Pants | 49 | 0.180 | 0.191 | 0.095 |
| Doff Uniform Shirt | 49 | 0.107 | 0.133 | 0.075 |
| Don Belt | 29 | 0.279 | 0.266 | 0.151 |
| Don Ear Plugs | 46 | 0.116 | 0.127 | 0.044 |
| Don Hair Net | 54 | 0.163 | 0.166 | 0.044 |
| Don Hard Hat | 48 | 0.099 | 0.100 | 0.040 |
| Don Safety Boots | 48 | 0.438 | 0.436 | 0.153 |
| Don Safety Glasses | 42 | 0.090 | 0.095 | 0.039 |
| Don Uniform Pants | 47 | 0.322 | 0.359 | 0.155 |
| Don Uniform Shirt | 47 | 0.313 | 0.320 | 0.061 |
| Wait to Hand Wash | 42 | 0.000 | 0.000 | 0.000 |
| Hand Wash | 42 | 0.244 | 0.225 | 0.170 |

Table 2. Time (in seconds) to don and doff items and wash hands

| Activity | N | Median (in seconds) | Mean (in seconds) | Stdev (in seconds) |
|---|---|---|---|---|
| Doff Belt | 30 | 3.720 | 4.620 | 2.940 |
| Doff Ear Plugs | 45 | 1.980 | 2.400 | 1.200 |
| Doff Hair Net | 53 | 4.860 | 5.040 | 1.620 |
| Doff Hard Hat | 48 | 4.440 | 4.680 | 1.500 |
| Doff Safety Boots | 49 | 14.640 | 12.900 | 7.560 |
| Doff Safety Glasses | 41 | 3.480 | 3.480 | 1.380 |
| Doff Uniform Pants | 49 | 10.800 | 11.460 | 5.700 |
| Doff Uniform Shirt | 49 | 6.420 | 7.980 | 4.500 |
| Don Belt | 29 | 16.740 | 15.960 | 9.060 |
| Don Ear Plugs | 46 | 6.960 | 7.620 | 2.640 |
| Don Hair Net | 54 | 9.780 | 9.960 | 2.640 |
| Don Hard Hat | 48 | 5.940 | 6.000 | 2.400 |
| Don Safety Boots | 48 | 26.280 | 26.160 | 9.180 |
| Don Safety Glasses | 42 | 5.400 | 5.700 | 2.340 |
| Don Uniform Pants | 47 | 19.320 | 21.540 | 9.300 |
| Don Uniform Shirt | 47 | 18.780 | 19.200 | 3.660 |
| Wait to Hand Wash | 42 | 0.000 | 0.000 | 0.000 |
| Hand Wash | 42 | 14.640 | 13.500 | 10.200 |

7

001694

40

b. The total time it took employees in different departments at Hormel facility in Beloit, Wisconsin to walk various distances at the start-of-shift and end-of-shift are presented in Table 3 below:

Table 3. Time (in minutes) to walk various distances at the start-of-shift and end-of-shift

| Clock Name | Area | Start of Shift | End of Shift |
|---|---|---|---|
| SF-255 | Grinding | 1.141 | 0.606 |
| SF-255 | Maintenance | 0.461 | 0.436 |
| SF-255 | Pre-Cook | 3.027 | 0.628 |
| SF-255 | Receiving | 1.573 | 0.613 |
| SF-255 | Store Room | 2.537 | 0.546 |
| SF-240 | Canning | 2.016 | 1.550 |
| SF-240 | Product Prep/Spice Room | 1.927 | 1.574 |
| SF-240 | QC | 1.333 | 1.538 |
| SF-240 | Retort | 1.937 | 1.515 |
| SF-240 | Sanitation | 2.326 | 1.529 |
| SF-291 | Depal | 2.630 | 0.633 |
| SF-291 | Packaging | 2.129 | 0.645 |
| SF-291 | Salsa | 1.033 | 0.600 |
| SF-291 | Shipping | 1.653 | 0.518 |
| SF-291 | Stork | 2.332 | 0.536 |

c. The total time it took employees in different departments at Hormel facility in Beloit, Wisconsin to don and doff uniform pants, uniform shirt, belt, safety boots, hardhat, earplugs, hairnet, and safety glasses; wash hands; and walk various distances at the start-of-shift and end-of-shift are presented in Table 4 below:

Table 4. Time (in minutes) to don, doff, wash, and walk various distances at the start-of-shift and end-of-shift

| Clock Name | Number of Employees | Area | Total Start-End of Shift |
|---|---|---|---|
| SF-255 | 18 | Grinding | 4.651 |
| SF-255 | 50 | Maintenance | 3.801 |
| SF-255 | 7 | Pre-Cook | 6.560 |
| SF-255 | 5 | Receiving | 5.091 |
| SF-255 | 6 | Store Room | 5.988 |
| SF-240 | 8 | Canning | 6.471 |
| SF-240 | 33 | Product Prep/Spice Room | 6.406 |
| SF-240 | 13 | QC | 5.776 |

8

001695

12

41

| Clock Name | Number of Employees | Area | Total Start-End of Shift |
|---|---|---|---|
| SF-240 | 5 | Retort | 6.357 |
| SF-240 | 19 | Sanitation | 6.760 |
| SF-291 | 5 | Depal | 6.187 |
| SF-291 | 20 | Packaging | 5.679 |
| SF-291 | 16 | Salsa | 4.538 |
| SF-291 | 6 | Shipping | 5.075 |
| SF-291 | 9 | Stork | 5.773 |

37. This completes my work on the above case. If new or additional data become available, I reserve the right to amend these findings.

_____
JEFFREY J. HERNANDEZ, PhD, PE, CPE

## VERIFICATION

STATE OF VIRGINIA

COUNTY OF FAIRFAX

Personally appeared before me, Lissette Garcia a Notary Public in and for said State and County, Jeffrey E. Fernandez, the within named declarant, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged that he executed the foregoing instrument for the purposes therein contained.

WITNESS my hand and seal at office, on this 19 day of April, 2012.

_____
Notary Public

My Commission Expires:

_____ Feb 28 2014 _____

LISSETTE GARCIA
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES FEB. 28, 2014
COMMISSION # 7305404

9

001696

13